**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CBC RESTAURANT CORP., *et al.*,[1] | Case No. 23-10245-KBO |
| Debtors. | (Jointly Administered) |
| | <u>**Obj. Deadline:**</u><br>**March 27, 2023 at Noon (Requested)**<br><u>**Hearing Date:**</u><br>**March 28, 2023 at 1:00 p.m. (ET) (Requested)** |

## SSCP RESTAURANT INVESTORS LLC'S
## MOTION TO APPOINT CHAPTER 11 TRUSTEE

SSCP Restaurant Investors LLC ("**SSCP**" or "**Lenders**" or "**Agent**") hereby submits this motion (the "**Motion**") to appoint a chapter 11 trustee (the "**Chapter 11 Trustee**") in the above-captioned cases (the "**Chapter 11 Cases**") of the debtors and debtors-in-possession (the "**Debtors**"). In support of this Motion, SSCP respectfully states as follows:

## PRELIMINARY STATEMENT

1. The appointment of a Chapter 11 Trustee is necessary in these Chapter 11 Cases due to organizational and management failures at the highest levels. Simply put, the only true stakeholders here—creditors like SSCP and the Debtors' franchisees, given certainty of deep insolvency—have no faith in the Debtors' leadership and direction, and it has become clear that reorganization with the *status quo* in place is impossible. Since the Debtors have no other known officers, Jay Pandya ("**Mr. Pandya**"), operator of Pandya Restaurant Growth Brands, LLC ("**PRGB**"), the Debtors' non-debtor parent affiliate, should not be allowed to remain as the sole

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include CBC Restaurant Corp. (0801), Corner Bakery Holding Company (3981), and CBC Cardco, Inc. (1938). The Debtors' service address is 121 Friends Land, Suite 300, Newtown PA 18940.

1

executive decision maker (regardless of whether the Debtors have engaged a Chief Restructuring Officer).

2. Mr. Pandya's actions, and that of PRBG, both pre- and post-petition, demonstrate a willingness (or ignorance) to operate a business enterprise based on minimal financial information and without even the most basic of commercial safeguards (such as having officers, much less director and officer insurance, for example). Indeed, Mr. Pandya's stewardship of the Debtors is, and has been, riddled with failed promises, continuing defaults, self-dealing, and a lack of honesty and transparency in the Debtors' operations. For example, these actions include, but are not limited to:

    a.    transfers of over $21 million of the Debtors' cash to entities owned and/or controlled by Mr. Pandya during 2021 and 2022 (with data on transfers in 2023 not yet available);

    b.    the failure to maintain the most basic financial safeguards necessary to operate an otherwise prominent chain of restaurants;

    c.    a disregard of contractual obligations and judicial processes resulting in millions of dollars in contractual damages and default judgments owing to third parties;

    d.    the failure to pay payroll withholding taxes and state sales taxes;

    e.    the continuing defaults under the Debtors' secured financing documents;

    f.    the use of funds from the Debtors' operations to pay Mr. Pandya's other businesses;

    g.    the lack of any corporate governance in the management of the Debtors' businesses;

    h.    the complete lack of a financial and accounting staff/department with the level of sophistication and candor necessary to address basic accounting and financial requirements;

    i.    the inability to maintain financial records in accordance with Generally Accepted Accounting Principles;

    j.    the callous disregard of written obligations with landlords and critical vendors; and

k.	the inability to maintain proper insurance for a business of this size and scope.

3.	SSCP has experienced a chronic and habitual lack of performance from the Debtors resulting in SSCP's lack of confidence that the best interests of the estates are being protected, or that a reorganization is remotely plausible or even possible under current management. Upon information and fact, Mr. Pandya and PRGB used the Debtors as a piggy bank – taking over $21 million of funds out of the Debtors' business for the benefit of entities owned and/or controlled by Mr. Pandya. Mr. Pandya's self-dealing in the business of the Debtors knows no bounds. His actions leading up to and since the filing of the Debtors' bankruptcy proceedings have reinforced SSCP's position that Mr. Pandya is incapable of acting in the best interest of the Debtors. At the hand of Mr. Pandya, these Debtors were driven into irrefutable insolvency and the creditors deserve an impartial third party—a Chapter 11 Trustee—to represent the estates in maximizing the recovery to creditors.

4.	Accordingly, grounds exist under 11 U.S.C. §§ 1104(a)(1) and (2) for the appointment of a Chapter 11 Trustee in these Chapter 11 Cases. The appointment of a Chapter 11 Trustee is in the best interests of the estates to ensure that control of the Debtors is vested in a completely independent party – not the current rudderless management helmed by Mr. Pandya.

5.	SSCP welcomed this bankruptcy process with the hope that oversight by the Bankruptcy Court would lead to responsible management and accountability and has urged the Debtors to engage an experienced and credible Chief Restructuring Officer since the earliest stages of these Chapter 11 Cases. Rather than act in the best interest of the estates, the Debtors waited until the date of the expiration of use of cash collateral on March 17, 2023, to engage a Chief Restructuring Officer. On March 18, 2023, the Debtors filed an application to retain Greg Baracato

as its Chief Restructuring Officer.[2]  Even still, the Chief Restructuring Officer remains subject to oversight by Mr. Pandya.  SSCP would agree to have Mr. Baracato serve as the Chapter 11 Trustee – in an independent role free from Mr. Pandya's control and interference.

6.      It is with this backdrop that SSCP files this Motion. To be clear, SSCP does not want the Debtors' operations to shut down. Rather, SSCP cannot stand by and let the Debtors' value and brand continue to diminish under the Debtors' current leadership – ultimately diminishing the value of the Collateral.  As these Chapter 11 Cases have evolved, it only becomes more clear that Mr. Pandya's involvement is detrimental to the long-term viability of the Debtors' businesses and that an independent trustee must be appointed.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This motion for relief from the automatic stay is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(G).

8.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

9.      The statutory predicates for the relief sought in this Motion are found in section 1104 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2007.1 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013 of the Local Rules for the United States Bankruptcy Court District of Delaware (the "**Local Rules**").

---

[2]      *See Debtors' Motion for Entry of an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code, Authorizing and Approving (I) the Agreement with CR3 Partners, LLC to Provide Greg Baracato to Serve as the Debtors' Chief Restructuring Officer and to Provide Temporary Staff; and (II) the Employment of Greg Baracato and the Temporary Staff Effective as of March 17, 2023* [D.I. 157].

10.     SSCP confirms its consent pursuant to Rule 9013-1(f) of the Local Rules to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution

## RELIEF REQUESTED

11.     By the Motion, SSCP respectfully requests that the Court enter an order, in substantially the form filed contemporaneously herewith, (a) granting the Motion; (b) directing the Office of the United States Trustee (the "**UST**") to appoint one disinterested person as Chapter 11 Trustee in these Chapter 11 Cases under and pursuant to Bankruptcy Code section 1104(a); (c) ordering the UST to seek approval of such appointment from this Court in accordance with Bankruptcy Code section 1104(d) and Bankruptcy Rule 2007.1(c); and (d) ordering the Debtors and any other individual or entity in possession of the Debtors' records and property to cooperate with the Chapter 11 Trustee and immediately turn over to the Chapter 11 Trustee all records and property of the estate in their possession or control as directed by the Chapter 11 Trustee.

## BACKGROUND

12.     On February 23, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases, pending consideration of this Motion.  On March 20, 2023, the UST appointed an official committee of unsecured creditors in these Chapter 11 Cases. [D.I. 158].

##### (i)     *Mr. Pandya, PRGB, and Prepetition Operations of the Debtors' Business*

13.     Mr. Pandya, through PRGB, bought the Debtors in October 2020.  *See* First Day Declaration,[3] ¶ 7.  Earlier in April 2020, Mr. Pandya also acquired the Boston Market brand.  *See* Corner Bakery Partners with Pandya Restaurant Growth Brands to Support Next Chapter of Growth, PRNewswire, (Oct. 29, 2020), *https://www.prnewswire.com/news-releases/corner-bakery-partners-with-pandya-restaurant-growth-brands-to-support-next-chapter-of-growth-301163550.html* (noting that Mr. Pandya's purchase of the Debtors was actually around October 29, 2020).

14.     Among other things, Mr. Pandya, directly or through owned or controlled entities, was a franchisee of Pizza Hut restaurants in and around Philadelphia, Pennsylvania.  *See Pizza Hut, LLC v. Ronak Foods, LLC*, 2022 WL 3544403, at *7 (E.D. Tex. June 17, 2022), *appeal docketed*, No. 23-40047 (5th Cir Jan. 24, 2023) (the collective defendants in the suit will be referred to as the "Pandya Brands").  Ultimately, the Pandya Brands defaulted under their obligations to Pizza Hut under relevant franchise agreements. and the parties entered into a subsequent agreement related to the default under the franchise agreement.  *See id.*[4]

15.     The legal issues referenced in Pizza Hut litigation are familiar, and follow a detrimental pattern of failing to comply with contractually-agreed to obligations.  Lamentably, those shortcomings are not an exception for Mr. Pandya or the businesses he owns and/or controls.

---

[3]     The "First Day Declaration" means the *Declaration of Jignesh Pandya, Chief Executive Officer and Chief Operating Officer of Corner Bakery, in Support of Chapter 11 Petitions and Certain First Day Emergency Motions* [D.I. 22] (the "**First Day Declaration**").  SSCP disputes many of the allegations made in the First Day Declaration.

[4]     The court at issue found the Pandya Brands liable to Pizza Hut for over $6.5 million in damages resulting from the Pandya Brands' breach of, among other things, the failure to comply with Pizza Hut's standards, not paying required fees, and failing to comply with contractually agreed to obligations.  *See Id.* 2022 WL 3544403, at *39 (stating that the Pandya Brands engaged in actions that negatively affected the Pizza Hut brand).

Indeed, since 2020, Mr. Pandya and various entities he owns and/or controls have been named defendants in at least 58 cases involving a number of matters related to, among other things, franchise disagreements, landlord disputes, and breach of contract claims. A list of these lawsuits is attached hereto as **Exhibit A**. This is in addition to the at least 84 cases filed against the Debtors since 2020. A list of these lawsuits against the Debtors is attached hereto as **Exhibit B**.

16.     Mr. Pandya has managed the Debtors' businesses without any observation of proper corporate governance. The Debtors were able to provide a corporate organizational chart which shows that the PRGB is the Corner Bakery Holding Company's direct parent company. *See* **Exhibit C**, attached hereto. The Debtors, however, did not maintain or have a corporate personnel organization chart. *See* **Exhibit D**, attached hereto. **In fact, according to Mr. Pandya, the Debtors have no officers.**

17.     Mr. Pandya appears to have commingled organizational and cash operations with various other entities he owns. Further, the Debtors state that Ms. Krupa Patel is the Debtors' Treasurer.[5] The Debtors have stated, however, that Ms. Patel is not an employee of the Debtors and the role of Treasurer is not an officer position. Further, the Debtors have not disclosed who Ms. Patel's actual employer is – even though SSCP has asked for confirmation multiple times. SSCP understands that Ms. Patel only became involved in the Debtors' business when the Debtors' prior director of finance and controller abruptly resigned.

18.     Through SSCP's initial analysis, limited due to the Debtors' lack of reliable information and SSCP's limited access,[6] it identified millions of dollars of cash transfers by the

---

[5]     *See Declaration of Krupa Patel, Treasurer of Corner Bakery, in Support of Certain First Day Emergency Motions and Application* [D.I. 79].

[6]     SSCP's initial analysis has been limited to the bank statements provided by the Debtors, the Debtors' cash subledgers through December 6, 2022, the 2021 and 2022 Due To/From Boston Market account subledger, the 2021 Additional Paid in Capital account subledger, and the trial

Debtors to Mr. Pandya's other owned and/or controlled businesses in 2021 and 2022, summarized as follows:

| Entity | Outgoing Transfers (from the Debtors) |
|---|---|
| **Boston Market** | $9,200,000 |
| **Pandya Management LLC ("PM")** | $5,620,000 |
| **Management Fees** | $6,410,000 |

*See* Waite Declaration, ¶ 4. Further, on December 26, 2021, the Debtors recorded a reclassification journal entry labeled "SK P12 RECLASS ROC", which credited the Due To/From Boston Market account in the amount of $8,199,075. *See id.*, ¶ 5. SSCP's understanding is that the receivable balance of approximately $8.2 million owed from Boston Market to the Debtors was adjusted to decrease the amount owed to the Debtors from Boston Market to $0, and that the amount of additional paid in capital was in turn reduced by approximately $8.2 million. *See id.* It is unclear why this journal entry was made and why amounts owed from Boston Market are affecting the Debtors' equity balances.[7] *See id.*

19. Additionally, SSCP's preliminary financial analysis has identified the following in the Debtors' financial records:

a. The amount of the Management Fees is not duplicative of the amounts transferred to PM in paragraph 18.

---

balances through September 2022. *See Declaration of Patrick Waite in Support of SSCP Restaurant Investors LLC's Motion to Appoint Chapter 11 Trustee* filed contemporaneously herewith (the "**Waite Declaration**"). SSCP generally reviewed amounts at issue greater than or equal to $50,000 or amounts payable to certain related parties. *See id.*, ¶ 3.

[7] Debtors' counsel explained that this journal entry may be due to a mischaracterization of debt and equity in the Debtors' financial statements for the period ending December 27, 2020. *See* Exhibit J (referenced below).

b. The provided bank statements that contain over $8 million of transfers in round amounts beginning in December 2022, including $5 million in January 2023 alone. The Debtors have not provided their general ledgers, subledgers or journal entries for any period after December 6, 2022. As such, it is unclear what these transfers relate to.

c. The Debtors' financial records include a $1.3 million entry for "loan re-payment BMC." The Debtors' records do not reflect a loan from a party named BMC. It is unclear what this amount reflects.

d. The Debtors may have bank accounts that were not disclosed to SSCP. The bank statements contain transfers between unidentified bank accounts and the Debtors' disclosed bank accounts.

e. On February 17, 2021, CBC Restaurant Corp. received a loan of $10,000,000 under the CARES Act (the "**PPP Loan**").[8] The PPP Loan cannot be fully accounted for in the accounting and banking information provided.

f. The Debtors used multiple auditing firms and have not provided financial statements audited in accordance with Generally Accepted Accounting Principles for the years ended December 31, 2021 and December 31, 2022.

*See id.*, ¶ 6.

20. SSCP has repeatedly requested copies of any management agreements or shared services agreements between the Debtors and PRGB, the Rohan Companies, or any other entity owned and/or controlled by Mr. Pandya. The Debtors have been unable to provide any such agreements, presumably because they do not exist. The transactions identified above represent a violation of the terms of the Pre-Petition Credit Facility Documents, including, but not limited to, Sections 6.7 and 6.12 of the Consent and Eighth Amendment to Credit and Guaranty Agreement, dated October 28, 2020, that limits, among other things, the investments and transactions that the

---

[8] *See* federalpay.org/paycheck-protecton-program/cbc-restaurant-corp-newtown-pa (containing the information describing the PPP Loan). Utilizing the same search tool, many of the entities owned and/or controlled by Mr. Pandya received similar loans. *See, e.g.,* https://www.federalpay.org/paycheck-protection-program/pandya-management-llc-newtown-pa (noting that PM received a $128,100 loan); https://www.federalpay.org/paycheck-protection-program/boston-market-corp-golden-co (same; Boston Market Corp. received a $10,000,000 loan);

Debtors may engage in with affiliate entities that are not parties to the Credit and Guaranty Agreement.

**(ii)** ***The Debtors' Prepetition Events of Default and Conduct***

21.     SSCP is the Debtors' sole senior-secured creditor, with its debt secured by all of the Debtors' assets (the "**Collateral**"), and is owed over $42.5 million.[9]  The Debtors have been in material default, and have totally ignored with impunity their obligations, under the loan documents supporting SSCP's senior secured debt, including (i) the Credit and Guaranty Agreement, and (ii) the Pledge and Security Agreement (together with all related documents, the "**Pre-Petition Credit Facility Documents**") since prior to May 25, 2022.   The Debtors' obligations under the Pre-Petition Credit Facility Documents were ultimately accelerated on September 15, 2022—over five (5) months ago, and the Debtors were given numerous opportunities to refinance the loan (a significant discount).  The Debtors were unable to deliver a suitable commitment letter

22.     Among the litany of issues underpinning the Debtors' pre-bankruptcy operations, one of the Debtors, CBC Restaurant Corp., has been a defendant in multiple lawsuits throughout the country, including allowing a myriad of default judgments (SSCP knows of eight default judgments), one of which resulted in the garnishment of its deposit accounts held at Citizens Bank.[10]  Two of the Debtors' deposit accounts held at Citizens Bank are subject to the Agent's Deposit Account Control Agreement ("**DACA**"). Following the garnishment of those accounts,

---

[9]     SSCP became the Debtors' largest creditor and holder of all rights as Lender and Agent under the Pre-Petition Credit Facility Documents via various pre-petition assignments and transfers executed by pre-petition lenders under the Pre-Petition Credit Facility Documents.

[10]     Under the Pre-Petition Credit Facility Documents, the Debtors were obligated to disclose to the Collateral Agent potential adverse litigation and unauthorized Indebtedness, but failed to do so.

Mr. Pandya informed SSCP (only days before the bankruptcy filing) that the Debtors had diverted the collection of accounts receivables into other *unauthorized* bank accounts in direct violation of and further breaching the Pre-Petition Credit Facility Documents and with an obvious intent to hinder, delay, and potentially defraud creditors.

23.     The Debtors' acts of ignoring the terms of the Pre-Petition Credit Facility Documents, diversion of cash collateral into unauthorized accounts, failing to comply with even the most basic covenants in the Pre-Petition Credit Facility Documents, and self-dealing are further evidenced herein.

### a.     Defaults Under the Pre-Petition Credit Facility Documents

24.     The Debtors' defaults under the Pre-Petition Credit Facility Documents began almost immediately after the loan was closed.[11]     As a result, on May 25, 2022 and September 15, 2022, respectively, Goldman Sachs Specialty Lending Group, L.P.  ("**Goldman**"), as the then Collateral Agent under the Pre-Petition Credit Facility Documents and one of SSCP's predecessors in interest, served the Debtors with formal notices (collectively, the "**Default and Acceleration Notices**"),[12] informing the Debtors, among other things, that (i) multiple Events of Default had occurred under the Pre-Petition Credit Facility Documents[13] and (ii) the Debtors' obligations under

---

[11]     *See* Waiver to Credit and Guaranty Agreement, dated March 26, 2021, referencing an event of default under the Pre-Petition Credit Facility Documents on March 15, 2021 due to the Debtors' failure to repay the entire balance of revolving loan obligations.  A true and correct copy of the Waiver to Credit and Guaranty Agreement is attached hereto as **Exhibit E**.

[12]     True and correct copies of the Default and Acceleration Notices are collectively attached hereto as **Exhibit F**.

[13]     These Events of Default included, among other things, the Debtors' failure to: (a) pay due accrued and outstanding interest and letter of credit fees owed under the operative documents, (b) pay required term loan installment payments; and (c) deliver required financial statements, compliance certificates, and lease trackers.  Further, the Debtors failed to notify the Agent that the Lender's cash collateral was the subject of a garnishment action preventing Lender from preserving its cash collateral.

the Pre-Petition Credit Facility Documents were accelerated.  Importantly, one of the Events of Default was the Debtors' failure to provide the most basic financial statements and information.

25.     In addition to sending the Debtors numerous emails requesting information, SSCP served the Debtors with a Notice of Request for Information on February 10, 2023,[14] wherein SSCP demanded that the Debtors turn over financial and business operations information (collectively, the "**Information Requests**"), as required under the Pre-Petition Credit Facility Documents, including: (a) profit and loss statements, (b) balance sheets, (c) statement of cash flows, (d) tax returns, (e) audited financial statements, (f) quarterly financial statements, and (g) copies of all bank statements.  Despite promises made, this information was not delivered.  Also on February 10, 2023, SSCP served on the Debtors a Notice of Foreclosure (the "**Foreclosure Notice**").[15]  Pursuant to the Foreclosure Notice, SSCP posted its collateral for public foreclosure sale scheduled for 12:00 p.m. (CT) on February 23, 2023.

26.     On February 17, 2023, SSCP served the Debtors with the Notice of Additional Events of Default (the "**Additional Defaults Notice**")[16] enumerating numerous further  Events of Default by the Debtors under the Pre-Petition Credit Facility Documents, including the Debtors (a) establishing or maintaining one or more deposit accounts at unauthorized institutions, (b) diverting proceeds from authorized and/or depositing of proceeds in unauthorized accounts, (c) failing to pay taxes as they became due, (d) incurring unauthorized indebtedness, (e) failing to notify the Collateral Agent of numerous lawsuits and default judgments, and (f) incurring

---

[14]     A true and correct copy of the Notice of Request for Information is attached hereto as **Exhibit G**.

[15]     A true and correct copy of the Foreclosure Notice is attached hereto as **Exhibit H**.

[16]     A true and correct copy of the Additional Defaults Notice is attached hereto as **Exhibit I**.

unauthorized liens.  The Debtors filed these Chapter 11 Cases in direct response to the Foreclosure Notice and the Additional Defaults Notice.

27.     In addition to the Debtors' defaults under the Pre-Petition Credit Facility Documents, the Debtors also failed to pay amounts due in the ordinary course of their operations. Prior to these Chapter 11 Cases, the Debtors informed SSCP that they (i) are in default on the payment of over $5.4 million in state sales taxes; (ii) are in default on the payment of over $4.0 million in employee payroll withholding taxes; (iii) owe over $6.5 million in outstanding judgments to landlords for lease obligations under which the Debtors have defaulted; and (iv) owe over $31.6 million in other account payables.

28.     Rather than seek an orderly transition in these Chapter 11 Cases, Mr. Pandya led these Debtors into a "crash landing" bankruptcy filing.  SSCP attempted to discuss the potential for the Debtors' smooth transition into bankruptcy with Mr. Pandya – a smooth transition that Mr. Pandya rejected outright.  *See Declaration of Ken Schwab in Support of SSCP Restaurant Investors LLC's Motion to Appoint Chapter 11 Trustee* (the "**Schwab Declaration**"), filed contemporaneously herewith.  Despite clearly being insolvent and owing a fiduciary duty to the Debtors' creditors, Mr. Pandya asked what personal benefits he would receive in return for a smooth transition into bankruptcy.  Indeed, Mr. Pandya's responses were "[w]hat is in it for me?" and "[w]hat do I get out of it?"  *See id.*  Mr. Pandya also demanded an immediate release of all liability and an indemnity as consideration for filing these Chapter 11 Cases.  *See id.*  Mr. Pandya's actions have been consistent since the filing of these Chapter 11 Cases – limited cooperation, seeking only personal benefits and options, and minimal focus on maximizing value for creditors.

### (iii)     *The Debtors' Continued Post-petition Failures*

29.     The Debtors' prepetition conduct has continued since the commencement of these Chapter 11 Cases.  The Debtors still do not employ any officers with fiduciary duties to the

Debtors' estates. All decisions are being made by Mr. Pandya and PRGB personnel. While the Debtors have purportedly engaged a Chief Restructuring Officer, Greg Baracato, he does not have authority to make independent decisions and is thus, still subject to Mr. Pandya's control and oversight. As Mr. Baracato is a well-known insolvency expert, SSCP would support the appointment of Mr. Baracato as the Chapter 11 Trustee.

30. Moreover, since the commencement of these cases, the Debtors' lack of fulsome disclosures has also continued. It has become apparent that even the most basic financial information needed to operate a business of this size is mysteriously lacking. After repeated requests by SSCP, the Debtors' professionals have stated that the following financial and operational information simply *does not exist*:[17]

      a.      2020-2022 audited or unaudited financial statements;

      b.      2020-2022 tax returns;

      c.      Corporate personnel organizational chart;

      d.      Monthly G&A detail statements for each Debtor, including salaries by employee;

      e.      Monthly statements of cash flows; and

      f.      Historical store-by-store operating financials.

Further, the Debtors continue to resist providing other financial information that is standard in multi-store restaurant businesses.

31. While the Debtors are required to provide necessary information under the Cash Collateral Order,[18] the information provided has been limited, untimely, and insufficient.

---

[17]     Attached hereto as **Exhibit J** are various emails from the Debtors' professionals stating that these documents do not exist.

[18]     The "Cash Collateral Order" means the *Stipulation and Agreed Bridge Order: (A) Extending Debtor's Authorized Use of Cash Collateral; and (B) Granting Related Relief* [D.I. 89].

32.     Further, the Debtors' professionals have disclaimed the accuracy of virtually all information provided from the Debtors' accounting and point-of-sale systems – noting that the only information accurate on the Debtors' point-of-sale system was food, wages, and sale information.  Even though the Debtors have only recently begun providing information and access required under the Cash Collateral Order, parties in interest cannot reasonably rely on such information.[19]

33.     The Debtors' ability to effectuate a value-maximizing transaction, and preserve the value of SSCP's Collateral, diminishes by the day due to the Debtors' failed leadership and habitual non-performance clouded by Mr. Pandya's self-dealing behavior.  SSCP has no faith that the Debtors' current management, of which none are employed by the Debtors, can guide the Debtors' through these Chapter 11 Cases.  An independent Chapter 11 Trustee is necessary to bring the Debtors' constituencies together and effectuate a value-maximizing transaction in these Chapter 11 Cases.[20]

---

[19]     Notably, the Debtors have sought to extend the time to file their Schedules and Statements to April 28, 2023, 65 days after the Petition Date.  *See Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [D.I. 140].  On information and belief, this request is because of the historical lack of financial information necessary to accurately prepare such reports and file under penalty of perjury.

[20]     Considering the ongoing decline in value and the historical improprieties uncovered thus far, SSCP has demanded that the Debtors proceed promptly with a sale of the assets pursuant to Section 363 of the Bankruptcy Code.

# ARGUMENT

**A.**     **The Court Must Appoint a Trustee Upon Finding of Cause or Where It Is in the Interests of Creditors and Other Interests of the Estates.**

34.     Section 1104(a) of the Bankruptcy Code provides that the Bankruptcy Court shall order the appointment of a trustee, at any time after the commencement of the case but prior to confirmation of a plan, on request of a party in interest or the U.S. Trustee,[21] and after notice and a hearing:

> (1)     for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2)     if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §1104(a)(1)-(2).

35.     Subsection (a)(1) addresses management's pre- and post-petition misdeeds or mismanagement, while subsection (a)(2) provides the court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement.  *In re Bellevue Place Assocs.*, 171

---

[21]   Section 1104(e) directs the U.S. Trustee to move for the appointment of a trustee under certain circumstances, providing as follows:

> The United States trustee *shall* move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.

11 U.S.C. § 1104(e) (emphasis added).

B.R. 615, 623 (Bankr. N.D. Ill. 1994). Where the court finds either that cause exists or that appointment is in the interest of the parties, an order for the appointment of a trustee is mandatory. *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

36.      A debtor in possession and its officers and managing employees have a fiduciary duty to creditors and shareholders, and an "obligation to treat all parties, not merely the shareholders, fairly." *In re The AdBrite Corporation*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56, 105 S.Ct. 1986, 85 L.Ed. 2d 372 (1985); *In re Hampton Hotel Investors, L.P.,* 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001); *see also Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA (In re Northwest Airlines Corporation),* 483 F.3d 160, 181 (2d Cir. 2007) (observing that a debtor in possession has a fiduciary duty to creditors and the estate). The presumption that a debtor should remain in possession of its estate and in control of its affairs holds only if management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("a debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the benefit of creditors,' and to refrain [ ] from acting in a manner which could damage the estate . . ." (citing *In re Sharon Steel Corp.* 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989)).

37.      Among the fiduciary duties of a debtor in possession is the primary goal of the bankruptcy process: "to get the creditors paid." *In re Ionosphere Clubs*, 113 B.R. at 169 (quoting *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984)). Importantly, "because the [debtor in possession's] fiduciary obligation is to the estate, and not to one group, the [debtor

in possession] must act to benefit the estate as a whole." *In re Microwave Prods. of Am., Inc.*, 102

B.R. 666, 671 (Bankr. W.D. Tenn. 1989); H*irsch v. Pa. Textile Corp., Inc. (In re Centennial*

*Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) (a chapter 11 debtor and its managers

owe fiduciary duties to the estate). Moreover, a debtor in possession's fiduciary duties also

"include a duty of care to protect the assets, a duty of loyalty and a duty of impartiality." *In re*

*Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995). To fulfill its duty of loyalty, a debtor in

possession must "avoid self-dealing, conflicts of interest and the appearance of impropriety." *Id.*

38.     When a debtor in possession is incapable of performing its fiduciary duties, or when

creditors' confidence in management evaporates, a chapter 11 trustee must be appointed.[22] *See In*

*re McCorhill Publ'g, Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); *In re Marvel Entm't Grp.*,

140 F.3d 463, 473 (3d Cir. 1998). "[I]n the appropriate case, the appointment of a trustee is a

power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy

process and to insure that the interests of creditors are served." *In re Suncruz Casinos, LLC*, 298

B.R 821, 828 (Bankr. S.D. Fla. 2003) (quoting *In re Intercat Inc.*, 247 B.R. 911, 920 (Bankr. S.D.

---

[22]     Although the Bankruptcy Code does not set forth the evidentiary standard for the appointment of a trustee under section 1104 of the Bankruptcy Code, the Third Circuit Court of Appeals has employed a "clear and convincing evidence" standard upon the party seeking appointment of a trustee. *See Official Comm. of Asbestos Claimants v. GI Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 319 (3d Cir. 2004) (citing *In re Marvel Entm't Group*, 140 F.3d 463, 471 (3d Cir. 1998)). Case law following the Supreme Court's 1991 decision in *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991) ("preponderance of the evidence" standard as the general level of proof required in bankruptcy cases) calls that standard into question. *See Tradex Corp. v. Morse*, 339 B.R. 823, 829-32 (D. Mass. 2006) (rejecting clear and convincing evidentiary standard in context of a motion to appoint a trustee in favor of following the Grogan rationale that a heightened standard of review should not be applied when "Congress has not explicitly adopted a standard different from the traditional preponderance standard"); *see also In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999) (same), *aff'd in part, vacated in part on other grounds*, 254 B.R. 509 (D. Conn. 2000). The distinction here is immaterial given that the evidence to be presented by SSCP will be more than enough to meet either standard. *See, e.g.*, *Crescive Landscape Mgmt. Inc. v. PHDC, LLC (In re PHDC, LLC)*, 2004 Bankr. LEXIS 1113, at *7 (Bankr. N.D. Ga. Apr. 28, 2004).

Ga. 2000)); *see also In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

39.     As explained more fully below, the appointment of a Chapter 11 Trustee is warranted under the circumstances, pursuant to either Bankruptcy Code section 1104(a)(1) or 1104(a)(2).

**B.      There Is Ample "Cause" within the Meaning of 11 U.S.C. § 1104(a)(1) to Warrant the Appointment of a Chapter 11 Trustee.**

40.     While section 1104(a)(1) of the Bankruptcy Code expressly identifies four bases upon which "cause" may be found -- fraud, dishonesty, incompetence, and gross mismanagement (all of which exist in this case) -- those enumerated grounds are not exclusive.  Additional grounds may be determined on a case-by-case basis.  *See In re V. Savino Oil*, 99 B.R. at 525; *In re Sharon Steel Corp.*, 871 F.2d at 1226.  Cause also may be established by the (1) materiality of the misconduct of the debtor's management, (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors, (3) existence of prepetition voidable preferences or fraudulent transfers, (4) unwillingness or inability of management to pursue estate causes of action, (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (6) self-dealing by management or waste or squandering of corporate assets.  *See In re Marvel Entm't Grp., Inc.*, 140 F.3d at 472-73; *In re Sharon Steel Corp.*, 871 F.2d at 1228; *In re Intercat, Inc.*, 247 B.R. at 920- 21.  Once a party has proven "cause" under section 1104(a)(1), a bankruptcy court must grant the requested relief.  *See In re V. Savino Oil*, 99 B.R. at 525; *In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

(i)    **The Debtors' Incompetence and Gross Mismanagement Mandate Appointment of a Chapter 11 Trustee**

41.    Pre-petition conduct of the type alleged to have occurred prior to the commencement of these Chapter 11 Cases is sufficient to warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("the Code is clear that the pre-petition conduct of the debtor's management may be the sole deciding factor" in the appointment of a chapter 11 trustee); *see also In re V. Savino Oil*, 99 B.R. at 526 ("[t]his pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

42.    As set forth above, the Debtors' management, led by Mr. Pandya and non-Debtor employees, resulted in numerous Events of Default under the Pre-Petition Credit Facility Documents, a failure to observe proper corporate governance, unexplained diversion of over $21 million of Debtors' funds to entities owned and/or controlled by Mr. Pandya and to undisclosed accounts to frustrate creditor protections, and a complete failure to provide agreed-upon information and transparency into the Debtors' financial health and operations.  Indeed, Mr. Pandya and PRGB exhibited a complete disregard for contractual obligations under the various contracts and leases that the Debtors were party to and a disregard for the judicial system by allowing a substantial number of default judgments to be entered against the Debtors throughout the United States and the garnishment of funds.[23]

---

[23]    *See Declaration of Brandon Stewart, Lease Administration Supervisor for Corner Bakery, In Support of First Omnibus Motion of the Debtors for Entry of an Order: (1) Authorizing the Rejection of Certain Unexpired Leases and Abandonment of Certain Personal Property (with Certain) Rejections and Abandonments Effective Nunc Pro Tunc as of the Petition Date); and (3) Granting Related Relief* [D.I. 141-1] (the "**Stewart Declaration**"), ¶ 10 (noting that the Debtors were subject to various civil actions related to a number of leases "in varying stages of the eviction process necessary for the Landlord to regain possession of its property and/or are evictions in

43. PRGB's prepetition conduct, the same party that is allegedly currently managing the Debtors' operations in these Chapter 11 Cases drove a business that was recognized as a "Top U.S. Restaurant Chain" in 2019[24] into a financially ruined business that does not even maintain routine financial information like monthly statements of cash flows.

44. Further, SSCP's preliminary analysis has uncovered over $21 million transferred from the Debtors' bank accounts to entities owned or controlled by Mr. Pandya. It is clear from his self-preserving and self-dealing conduct that Mr. Pandya will not investigate these transfers for the benefit of the Debtors' estates.

45. These facts establish that the Debtors and their management are unable to serve as estate fiduciaries and mandate the immediate appointment of a Chapter 11 Trustee. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(l)."); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil*, 99 B.R. at 525. Further, the Debtors have failed to take any actions to insert any independence into the management of the Debtors' businesses to properly carry out fiduciary duties for the benefit of the Debtors' estates. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355 ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."'); *In re William H. Vaughan & Co.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (holding that appointment of a trustee was necessary because the debtor could not be trusted to scrutinize dealings between debtor and debtor's president).

---

which the Landlord is seeking, or secured pre-petition, a money judgment against the Debtors for damages, a few in an amount close to or in excess of $1 million dollars.").

[24] *See* First Day Declaration, ¶ 5.

46. For the reasons set forth herein, it is apparent that cause exists to appoint a Chapter 11 Trustee under the parameters set forth in Section 1104(a)(1).

**(ii)** *The Court Must Appoint a Chapter 11 Trustee Under 11 U.S.C. § 1004(a)(2) Because Such Appointment In the Best Interests of the Debtors' Estates*

47. Section 1104(a)(2) of the Bankruptcy Code "creates a flexible standard [that] … allows the appointment of a trustee even when no 'cause' exists," but where to do so would be in the best interest of the constituents. *See In re Ionosphere Clubs, Inc.*, 113 B.R. at 168; *In re Sharon Steel Corp.*, 871 F.2d at 1226. Even if a court were to determine that the appointment of a trustee is not mandated by the analysis required in section 1104(a)(1) of the Bankruptcy Code, a court may exercise its discretion and still appoint a trustee under section 1104(a)(2) of the Bankruptcy Code if doing so is in the best interest of the parties. *See* 11 U.S.C. § 1104(a)(2); *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re The 1031 Tax Group, LLC,* 374 B.R. 78, 90-91 (Bankr. S.D.N.Y. 2007).

48. Under section 1104(a)(2), courts "look to the practical realities and necessities." *In re Euro-American Lodging Corp.*, 365 B.R. at 427. Among the factors courts consider are "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Id*. (citations omitted).

49. In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers ... equitable remedies are a special blend of what is necessary, what is fair and what is workable." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); *see In re Wings Digital Com.*, 2005 Bankr. LEXIS 3476, at *14 (Bankr. S.D.N.Y. May 16, 2005) (section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)). In exercising these broad equitable

powers to appoint a trustee under Bankruptcy Code section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. at 345. Accordingly, the standard for appointment of a chapter 11 trustee under section 1104(a)(2) is flexible. *See* 124 Cong. Rec. H11, 102 (daily ed. Sept. 28, 1978); S17, 419 (daily ed. October 6, 1978). Each of the four considerations described above warrants appointment of a trustee here.

            a.       **Current Management Cannot Be Trusted to Carry Out Their Fiduciary Duties.**

50.      An independent trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code where, as here, a debtor and/or its management and insiders suffer(s) from material conflicts of interest and cannot be trusted to conduct independent investigations of questionable transactions in which they were involved. *See, e.g., In re PRS Ins. Group, Inc.*, 274 B.R. at 389 (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders are a significant asset of the estate); *In re Microwave Prods. of Am., Inc.*, 102 B.R. at 676 (chapter 11 trustee appointed where debtor was "not in a strong-posture to pursue possible claims" due to conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); *In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. N.D.W. Va. 1980) (appointing trustee under section 1104(a)(2) where "[t]he magnitude of the number of inter-company transactions places current management of [the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]").

51. A complete analysis of the dealings between the Debtors and PRGB has not been performed. However, we know that the Debtors' financial performance declined significantly following PRGB's acquisition of the Debtors' business in 2020. We know that millions of dollars were transferred by the Debtors to entities owned or controlled by Mr. Pandya. We also know that Mr. Pandya managed the Debtors' operations either directly or through PRGBs's employees and officers, rather than officers with fiduciary duties at the Debtor level. Remarkably, the Debtors did not maintain any director and officer liability insurance because they had no directors and officers.

52. The Debtors' attempt for independent leadership is only half-hearted. Anyone hired by the Debtors is still subject to the whims and control of Mr. Pandya. Given the need for an independent investigation into PRGB's actions, a Chapter 11 Trustee must be appointed.

### b. Creditors Lack Confidence in the Debtors

53. The Debtors do not have the confidence of their creditor body. The creditors' level of mistrust is very high due to the Debtors' pre-petition misconduct and mismanagement. SSCP does not believe that the Debtors, under this management, can effectively reorganize or even liquidate optimally. Appointment of a Chapter 11 Trustee is the only remedy that will ensure that the Debtors are managed honestly and for the benefit of all of their stakeholders and relieve the current state of distrust. *See In re Marvel Entm't*, 140 F.3d at 474; *In re Cardinal Indus., Inc.*, 109 B.R. at 755, 766-767 (Bankr. S.D. Ohio 1990) (appointing trustee under section 1104(a)(2) where debtors' self-dealing and breach of fiduciary duties resulted in a serious erosion of trust and confidence by creditors and where benefits of potential claims against insiders of estate outweighed any cost of appointing a trustee); *In re Microwave Prods. of Am., Inc.*, 102 B.R. at 673-675 (same). The appointment of a trustee will provide creditors with the reassurance that a

fair and independent fiduciary was finally managing the Debtors. This result, in turn, would enable an efficient and equitable resolution of these Chapter 11 Cases for all parties in interest.

### c. The Benefits of Appointing a Chapter 11 Trustee Far Outweigh the Costs of Such Appointment

54. The benefits of a Chapter 11 Trustee greatly outweigh the burden to the Debtors from such appointment. At this stage of these Chapter 11 Cases, the appointment of a trustee will not be an unduly burdensome expense for the Debtors' estates. Although the structure of the Debtors' operations is somewhat complex, the Debtors' capital structure is not. What is complex, and what will require effort to untangle, is the web of transactions that the Debtors' management created that resulted in these Chapter 11 Cases. Unlike the Debtors' management, a Chapter 11 Trustee would be uniquely situated to untangle this web in a manner that is fair to all creditors.

55. As set forth above, there are substantial benefits to appointing an independent trustee here. The Debtors operate a substantial business that, if managed properly, will surely provide meaningful value to creditors. A fair and efficient sale process free from the stain of self-dealing can yield significant value. *See In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (concluding that appointment of chapter 11 trustee to manage a sale process was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process").

56. In addition, SSCP believes that the Debtors possess numerous and valuable causes of action that are not likely to be prosecuted if current management retains control of the Debtors, and without the benefit of an official committee. These causes of action may result in significant recoveries to the Debtors' estates. Such causes of action will need to be investigated and pursued, and the Debtors, for obvious reasons, will be unable to conduct this investigation. By contrast, a

Chapter 11 Trustee will be able to undertake the independent investigation needed and pursue any necessary litigation.

57. Moreover, the costs to appointing a trustee here are minimal. There is no reason to believe that a qualified trustee would have a steep learning curve in getting up to speed, or would generate costs exceeding those of a chief restructuring officer. Moreover, since a Chief Restructuring Officer was only employed on March 17, 2023, there is no institutional knowledge lost if control of the Debtors is shifted to a truly independent fiduciary – a Chapter 11 Trustee.

58. The entity whose Collateral is most impacted by the appointment of another estate fiduciary is the movant here. The cash to be utilized to pay for a Chapter 11 Trustee is SSCP's cash collateral. The importance of installing an independent fiduciary in these Chapter 11 Cases is so significant that SSCP is willing to expend some of that cash collateral for the benefit of the Debtors' estates.

59. Simply put, the Debtors lack any semblance of management that will protect the Debtors' estates. As stated herein, Mr. Pandya and PRGB, both pre- and post-petition, have failed these Debtors' estates and acted in their own interests. The Debtors have vehemently resisted the consensual appointment of an independent officer – but have hired a Chief Restructuring Officer still subject to Mr. Pandya's whims and management. Rather, the Debtors seek to continue to rely on the same management that has lost the trust of the Debtors' creditor and franchisee bodies.

60. Based on the foregoing, the benefits of a Chapter 11 Trustee outweigh the costs -- and could help immeasurably in ensuring that the recovery to creditors is maximized.

## <u>RESERVATION OF RIGHTS</u>

61.     SSCP expressly reserves the right to supplement or amend this Motion and the relief requested herein. Accordingly, this Motion is without prejudice to the SSCP's rights to further assert any other issues in support of the Motion.

*(Remainder of page intentionally left blank)*

## CONCLUSION

WHEREFORE, SSCP respectfully requests that the Court enter its order (a) granting the Motion; (b) ordering the UST to appoint one disinterested person as Chapter 11 Trustee in these Chapter 11 Cases under section 1104(a) of the Bankruptcy Code; (c) ordering the U.S. Trustee to seek approval of such appointment from this Court in accordance with section 1104(d) of the Bankruptcy Code and Bankruptcy Rule 2007; (d) ordering the Debtors and any other individual or entity in possession of the Debtors' records and property to cooperate with the Chapter 11 Trustee and immediately turn over to the Chapter 11 Trustee all records and property of the estate in their possession or control as directed by the Chapter 11 Trustee; and (e) granting SSCP such other and further relief as the Court may deem appropriate.

Dated: March 20, 2023
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Ricardo Palacio*

Ricardo Palacio (DE Bar No. 3765)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel: (302) 654-1888
Fax: (302) 654-2067
Email: RPalacio@ashbygeddes.com

-and-

**FOLEY & LARDNER LLP**
Holland N. O'Neil, Esq. (admitted *pro hac vice*)
Mark C. Moore, Esq. (admitted *pro hac vice*)
Stephen A. Jones, Esq. (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Tel: (214) 999-3000
Fax: (214) 999-4667
Email(s): honeil@foley.com
          mmoore@foley.com
          sajones@foley.com

*Counsel to SSCP Restaurant Investors LLC*