**ASSET PURCHASE AGREEMENT**

**By and Between**

**CORBAK ACQUISITION LLC**

**and**

**CORNER BAKERY HOLDING COMPANY;**

**CBC RESTAURANT CORP.;**

**CBC CARDCO, INC.**

**May 19, 2023**

**ASSET PURCHASE AGREEMENT**

**THIS ASSET PURCHASE AGREEMENT**, dated as of May 19, 2023 (this "Agreement"), is entered into by and between Corbak Acquisition LLC, a Delaware limited liability company ("Purchaser"), on the one hand, and Corner Bakery Holding Company, a Delaware corporation, CBC Restaurant Corp., a Delaware corporation, and CBC Cardco, Inc., a Florida corporation (each a "Seller," and collectively, the "Sellers"), on the other hand. Purchaser and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

**RECITALS**

**WHEREAS**, Sellers operate a fast-casual restaurant chain, Corner Bakery, consisting of both company-owned and franchised locations, which offer kitchen-crafted breakfast, lunch, and dinner and catering to guests in American Italian café locations (the "Business");

**WHEREAS**, Sellers desire to sell, transfer, convey, assign, and deliver the Purchased Assets and to assign the Assumed Liabilities, and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS**, on February 22, 2023, Sellers filed voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court and commenced a Chapter 11 Bankruptcy Case for each Seller; and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order to be entered in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

**1.**
**DEFINITIONS**

1.1.    **Definitions.** The following terms, as used herein, have the following meanings:

"**Accounts Receivable**" means all accounts and notes receivable (whether current or non-current) of Sellers with respect to goods shipped, products sold, or services rendered before the Closing Date, including receivables from catering sales, credit card processors, franchisees, the sale of gift cards in retail outlets, and allowances due from landlords under Real Property Leases, as defined herein, (but only to the extent such Real Property Leases constitute Assigned Agreements, as defined herein).

"**Actual Cure Costs**" means, for only the Assigned Agreements, all amounts that are determined by a final and nonappealable order of the Bankruptcy Court that must be paid—including pursuant to Sections 363, 365(b)(1)(A), and 365(b)(1)(B) of the Bankruptcy Code—in connection with the assumption and/or assignment of the Assigned Agreements to Purchaser as provided herein.

"**Adjustment Escrow Amount**" has the meaning set forth in Section 2.8(d).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"**Assigned Agreement**" means: (i) all Franchise Agreements; and (ii) those Contracts and Real Property Leases that are set forth on Schedule 2.1(a).

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 2.11(a).

"**Assumed Liabilities**" have the meaning set forth in Section 2.3.

"**Avoidance Actions**" means all avoidance claims or causes of action arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state law.

"**Bankruptcy Cases**" means the cases commenced by the Sellers under the Bankruptcy Code and pending before the Bankruptcy Court and jointly administered under Case No. 23-10245.

"**Bankruptcy Code**" means chapter 11 of title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bidding Protections Order**" has the meaning set forth in Section 2.9(a).

"**Breakup Fee**" has the meaning set forth in Section 7.4(b).

"**Business**" has the meaning set forth in the Recitals hereto.

"**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Wilmington, Delaware are authorized or required by Law, as defined herein, to close.

"**Casualty**" has the meaning set forth in Section 7.7(b).

"**Casualty Proceeds**" has the meaning set forth in Section 7.7(b).

"**CCPA**" has the meaning set forth in Section 3.17.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*), and any Laws promulgated thereunder.

"**Certified True-Up**" has the meaning set forth in Section 2.8(f).

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.10 of this Agreement.

"**Closing Date**" means the date of the Closing.

"**Closing Deadline**" has the meaning set forth in Section 11.1(b).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Condemnation**" has the meaning set forth in Section 7.7(a).

"**Condemnation Proceeds**" has the meaning set forth in Section 7.7(a).

"**Confidential Information**" means any trade secret or confidential proprietary information with respect to the Purchased Assets, including, without limitation, any trade secret or confidential proprietary information included in or embodied in any of the following: methods of operation; products; technology; inventions; trade secrets; know-how; software; marketing methods; sales plans and strategies; suppliers; competitors; markets; market surveys; techniques; research; development; production processes; finances; technical data; policies; strategies; designs; formulas; developmental or experimental work; improvements; discoveries; plans for research or future developments; database schemas or tables; infrastructure; development tools or techniques; training manuals; marketing; distribution and installation plans; processes and strategies; methodologies; business plans; budgets; financial information and data; customer and client information; prices and pricing strategies; costs; fees; customer and

client lists and profiles; employee, customer, and client nonpublic personal information, supplier lists, business records, audit processes, management methods and information; reports, recommendations and conclusions; or other specialized information or proprietary matters as of the Closing Date. Confidential Information does not include, and there will be no obligation hereunder with respect to, information that: (i) is generally available to the public on the date of this Agreement; or (ii) becomes generally available to the public other than as a result of a disclosure by such Person not otherwise permissible hereunder.

"**Confidentiality Agreement**" means the Confidentiality Agreement dated April 30, 2023, between Sellers and Purchaser.

"**Contract**" means any contract, agreement, equipment lease, license, purchase order, commitment, or other legally binding arrangement with respect to which any one or more of the Sellers is a party other than a Real Property Lease.

"**Deposits**" has the meaning set forth in Section 2.8(b).

"**Designation Deadline**" has the meaning set forth in Section 7.5(d).

"**Designation Rights Asset**" has the meaning set forth in Section 7.5(b).

"**Designation Rights Asset Term**" has the meaning set forth in Section 7.5(f).

"**Designation Rights Assets Proceeds**" have the meaning set forth in Section 7.5(f).

"**DRA Location**" means each store location that is subject to a Real Property Lease that is a Designation Rights Asset as set forth on Schedule 7.5(b).

"**Effective Date**" means the date on which all conditions to effectiveness of this Agreement and the Sale Order have been satisfied or waived and the Transactions contemplated by this Agreement are consummated.

"**Employee Benefit Plan**" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement, or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any liability.

"**Employment-Related Laws and Obligations**" has the meaning set forth in Section 3.12.

**"Environmental Laws"** means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative orders and determinations, all contractual obligations and all common Law, in each case concerning public health and safety, pollution, or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state laws).

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

**"ERISA Affiliate"** means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

**"Escrow Agent"** means KCC LLC.

**"Escrow Agreement"** means that certain escrow agreement, dated as of the date hereof, by and among Sellers, the Purchaser, and the Escrow Agent.

**"Estimated Wind Down Expenses"** means any and all administrative costs and expenses of Sellers that Sellers reasonably anticipate incurring during the Bankruptcy Cases (whether before, on, or after Closing) in connection with winding down their respective bankruptcy estates (including payment of all administrative claims), in an amount not to exceed $150,000. Estimated Wind Down Expenses shall include, without limitation, and may be adjusted as necessary to provide for payment of, the following: (i) Seller Retained Professional Fees; (ii) professional fees and expenses of estate professionals during the wind-down of the Sellers' bankruptcy estates, which, along with Seller Retained Professional Fees, shall be deposited into an escrow account; (iii) and the anticipated expenses of the wind-down of the Sellers' bankruptcy estates from and after the Closing Date, including a *pro rata* allocation of any rent or wages paid by Sellers prior to the Closing Date; (iv) and any obligations or expenses incurred by Sellers to perform their obligations under this Agreement.

**"Excluded Assets"** have the meaning set forth in Section 2.2.

**"Excluded Liabilities**" have the meaning set forth in Section 2.4.

**"Final Order"** means an order of the Bankruptcy Court or any other court as to which: (i) any appeal or petition for review, rehearing, or certiorari that has been taken has been

finally determined or dismissed; or (ii) the time for appeal or petition for review, rehearing, or certiorari has expired and no appeal has been filed timely. In the case of an order of the Bankruptcy Court, the time for appeal, for purposes of this definition, will be the time permitted for an appeal to the United States District Court for the District of Delaware.

"**Final True-Up**" has the meaning set forth in Section 2.8(e).

"**Final True-Up Statement**" has the meaning set forth in Section 2.8(e).

"**Franchise Agreement**" means any Contract between one or more of Sellers, on the one hand, and a third party on the other hand, pursuant to which such Seller has granted a license to the third party to use such Seller's brand name, trademark, trade name, logo, or service mark in conducting business.

"**Gift Card Sales**" has the meaning set forth in Section 2.8(b).

"**Good Faith Deposit**" has the meaning set forth in Section 2.9(a).

"**Governmental Authority**" means any federal, state, local, municipal, foreign, supranational, or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official, or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

"**Hazardous Substances**" means any pollutants, contaminants, or chemicals, and any industrial, toxic, or otherwise hazardous materials, substances, or wastes and any other substance with respect to which liability or standards of conduct may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde, and lead based paint.

"**Improvements**" means all leasehold improvements located, placed, constructed, or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Lease constitutes an Assigned Agreement ), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing, and refrigeration systems, facilities, lines, installations, and conduits.

"**Independent Accounting Firm**" means any of the nationally recognized "big four" accounting firms, as mutually agreed.

"**Insider**" has the meaning set forth in Section 11 U.S.C. § 101(a)(31).

"**Intellectual Property Rights**" means all of Sellers' intellectual property rights (but, in each case, only to the extent such intellectual property rights are transferrable without the consent of any third party), including: (i) patents, patent applications, and patent rights; (ii) trademarks (registered, unregistered, and at common Law), trademark registrations and applications, trade names (including Corner Bakery and any other names used by Sellers for, or in connection with, the Business), logos, trade dress, brand names, service marks (registered and at common Law), service mark registrations and applications, websites, domain names, and other indicia of source and all goodwill associated therewith (subject to those restrictions under the Franchise Agreements), works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, Recipes, databases, and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; and (vi) all documentation and media constituting, describing, or relating to the above, including manuals, memoranda, and records.

"**Inventory**" means all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory, and stock in trade owned by any Seller, whether or not prepaid, and wherever located, held, or owned, including all fresh and frozen foodstuffs, non-alcoholic beverages, disposable paper goods (such as napkins and paper towels), soaps and detergents, condiments, retail merchandise, replacement and spare parts, and fuels and other similar items.

"**Knowledge of Sellers**" or any other similar knowledge qualification in this Agreement means all facts actually known by Greg Baracato  after due inquiry, including a review of the Sellers' books and records and interviews with Jay Pandya and Krupa Patel.

"**Law**" means any law, statute, regulation, rule, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"**Leased Real Property**" means all of the real property leased or subleased by Sellers in connection with conducting the Business, including the real property locations set forth on Schedule 1.1(ff).

**"Legal Proceeding"** means any judicial, administrative, or arbitral actions, suits, proceedings (public or private), or Claims or any proceedings by or before a Governmental Authority, and any appeal from any of the foregoing.

**"Liability"** means any debt, loss, damage, adverse claim, fine, penalty, liability, or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), whether contingent, at Law or in equity or otherwise, including any liability based on successor liability theories.

**"Lien"** means, with respect to any property or asset, any mortgage, lien (statutory or otherwise, including PACA Liens), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. For the avoidance of doubt, the definition of Lien will not be deemed to include the grant of any license or sublicense by any Seller of Intellectual Property Rights.

**"Management Agreement"** means an agreement substantially in the form attached as Exhibit 1, with such changes (if any) as shall be reasonably acceptable to Purchaser and Sellers, and which provides that Purchaser will be responsible for the operating costs associated with operating the DRA Assets or performing under any Contracts that are DRA Assets and that the economic benefit of the operation of the Purchased Assets accrues to the Purchaser.

**"Material Adverse Effect"** means any change, effect, event, fact, circumstance, or development that, individually or in the aggregate, has had or reasonably could be expected to have a material adverse effect on the Business, the Assumed Liabilities, or the Purchased Assets, taken as a whole, including without limitation the termination or rejection of the Debtor's contract with Sysco, but excluding any such effect to the extent resulting from or arising in connection with: (i) the pendency or consummation of the Transactions or the public announcement thereof; (ii) changes or conditions affecting the industries generally in which Sellers operate unless such change has a disproportionate effect on the Business or the Purchased Assets; (iii) changes in national or international business, economic, political, or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the

United States of America; (iv) changes in financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or interpretations thereof; (vi) changes resulting from the commencement and continuation of the Bankruptcy Cases; (vii) failure of any one or more of the Sellers to meet financial projections, (viii) any action taken by any Seller as required or contemplated by this Agreement.

**"Material Contracts"** have the meaning set forth in <u>Section 3.15</u>.

**"Multiemployer Plan"** means any "multiemployer plan" (as defined in ERISA § 3(37)) contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any liability.

**"Non-Assigned Agreements"** means any Contract or Real Property Lease that is not an Assigned Agreement or a Designation Rights Asset or that is at any point excluded from being an Assigned Agreement or a Designation Rights Asset.

**"Order"** means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of—or entered, issued, made, or rendered by—any Governmental Authority.

**"Ordinary Course of Business"** means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice (including with respect to quality, quantity, and frequency).

**"Organizational Amendments"** have the meaning set forth in <u>Section 5.5(a)</u>.

**"PACA"** means the Perishable Agricultural Commodities Act, 7 U.S.C. Section 499a *et seq*.

**"PACA Lien"** means any Lien (including any trust or other arrangement in the nature of a Lien) for the benefit of producers, suppliers, or sellers of livestock, poultry, fruits, vegetables, or other farm products that operates to create a first priority Lien in favor of such producers, suppliers, or sellers (or agents or assignees thereof) covering farm products (and the products and proceeds thereof) to secure the unpaid purchase price of such farm products, including any trust established by PACA Section 499e PACA, PSA Section 196b or Section 197b, or any equivalent applicable state Laws.

**"Permits"** means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans, and the like.

**"Permitted Liens"** means: (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased

Assets pursuant to this Agreement; (ii) Liens that arise under zoning, building codes, land use, and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iii) Liens for Taxes not yet due and payable; and (iv) with respect to leased or licensed property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assigned Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint venture, trust, or other entity or organization, including a Governmental Authority.

"**Petition Date**" means February 22, 2023, the date on which Sellers commenced the Bankruptcy Cases.

"**Pre-Closing Tax Period**" means: (i) any Tax period ending on or before the Closing Date; and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Prepaid Rent Adjustment**" has the meaning set forth in Section 2.8(b).

"**Privacy Policy**" has the meaning set forth in Section 3.17.

"**Privileged Matter**" has the meaning set forth in Section 2.2(q).

"**Property Taxes**" means all personal property taxes, real property taxes, and similar *ad valorem* obligations with respect to Purchased Assets for any Tax period, including those which are assessed in locations where taxes are billed in arrears, but excluding any Claims for real property taxes to the extent that such Claims are included in an Allowed Cure Amount with respect to a Purchased Asset .

"**Property Tax Estimate**" has the meaning set forth in Section 2.8(a).

"**PSA**" means the Packers and Stockyards Act, 7 U.S.C. Section 181 *et seq*.

"**Purchase Price**" has the meaning set forth in Section 2.6.

"**Purchased Assets**" have the meaning set forth in Section 2.1.

"**Purchased Location**" means each store, storage unit, or office location that is subject to a Real Property Lease that is an Assigned Agreement as set forth on Schedule 2.1(a).

**"Real Property Lease"** means any lease or sublease of commercial real estate—including all amendments, modifications, or supplements thereof—pursuant to which a Seller occupies any Leased Real Property.

**"Recipes"** has the meaning set forth in Section 2.1(m).

**"Release"** has the meaning set forth in CERCLA.

**"Sale Order"** means an Order of the Bankruptcy Court that has become a Final Order in the Bankruptcy Cases: (i) approving this Agreement; (ii) authorizing the sale of the Purchased Assets to Purchaser pursuant to Sections 363 of the Bankruptcy Code; (iii) authorizing the assumption and assignment of the Assigned Agreements pursuant to Section 365 of the Bankruptcy Code; and (iv) authorizing the Transactions, and satisfactory, in form and substance, to the Purchaser, in its reasonable discretion.

**"Seller Retained Professional Fees"** means (i) an aggregate amount equal to the reasonable and documented out of pocket fees and expenses incurred by Professionals retained by Sellers pursuant to section 327 of the Bankruptcy Code or any other estate professionals, in each case, to the extent such out-of-pocket fees and expenses (a) are accrued and unpaid as of the Closing Date, and (b) with respect to transaction-based fees, and (ii) with respect to hourly or monthly professionals, have been authorized to be paid by the Bankruptcy Court in orders approving retention applications or otherwise.

**"Store Cash Amount"** has the meaning set forth in Section 2.8(c).

**"Store-Level Cash"** has the meaning set forth in Section 2.1(b).

**"Tax"** means: (i) any tax, governmental fee, or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax, or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign); or (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

**"Transaction Fee"** means the fee, up to $1,000,000, that will be earned by Hilco Corporate Finance LLC upon Closing of the Transaction.

**"Transactions"** has the meaning set forth in the Recitals hereto.

**"Transfer Taxes"** has the meaning set forth in Section 7.9.

**"Transfer Tax Estimate**_" has the meaning set forth in_ Section 2.8(a)_._

**"Transferred Employee"** has the meaning set forth in Section 8.1(a).

**"Transferred Employees' Employment Date"** has the meaning set forth in Section 8.3.

## 2.
## PURCHASE AND SALE

2.1.    **Purchase and Sale.** Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets will be free and clear (except for Permitted Liens and the Assumed Liabilities) of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), or Liens, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date. Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers agree to sell, transfer, and deliver to Purchaser, and Purchaser agrees to purchase, acquire, and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, all right, title, and interest of Sellers as of the closing Date in and to the following tangible and intangible assets, properties, and rights (the "Purchased Assets"):

a)    subject to Sections 7.5(c) and 7.5(d), all rights of Sellers under the Assigned Agreements, including all Franchise Agreements and all other Contracts and Real Property Leases designated as Assigned Agreements on Schedule 2.1(a);

b)    all cash, cash equivalents, and similar cash items at each Purchased Location and each DRA Location on the Closing Date in cash registers, safes, strongboxes, and lock boxes consistent with past practice ("Store-Level Cash").

c)    all Inventory at Purchased Locations;

d)    all tangible personal property, including all machinery, equipment, tools, point of sale systems, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, cutlery, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a capital lease, but only to the extent that Purchaser assumes such capital lease as an Assigned Agreement) located at a Purchased Location;

e)    all insurance policies relating to the Business which Purchaser, at its option,

identifies that it wants transferred by designating such insurance policy as an Assigned Agreement on Schedule 2.1(a), and all claims under such insurance policies for property damage related to the Purchased Assets; to the extent set forth in Section 7.7, all proceeds of any condemnation proceeding affecting the Purchased Assets; and all warranty claims against third parties arising with respect to the Purchased Assets as well as all credits, premium refunds, proceeds, causes of action, or rights with respect to any such insurance policies, condemnation proceedings, or warranty claims. For the avoidance of ambiguity, D&O insurance policies and any claims thereunder are not Purchased Assets;

f)      all Permits (in each case to the extent transferable without the consent of any Governmental Authority, and regardless of the length of the process necessary to effect such a transfer, unless the Bankruptcy Court orders the transfer of such Permit) other than Permits that relate specifically to a store location that is not a Purchased Location;

g)      all Intellectual Property Rights, including the items set forth on Schedule 2.1(g), and all indoor and outdoor signage, advertising, promotional materials, décor, pieces, accents, and artwork or decorations;

h)      all cars, trucks, vans, other industrial vehicles, and other motor vehicles set forth on Schedule 2.1(h);

i)      all security deposits held by lessors under Real Property Leases that constitute Assigned Agreements; all utility deposits, security deposits, and other deposits held by vendors or trade creditors that relate to a Purchased Location; and all deposits held by parties to Contracts that constitute Assigned Agreements;

j)      all deposits held by Seller relating to prepaid, unearned catering sales;

k)      all Improvements other than Improvements that relate specifically to a location that is not a Purchased Location;

l)      all rights to the telephone and facsimile numbers, email addresses, URLs, and social media accounts used by Sellers other than telephone and facsimile numbers that relate specifically to a location that is not a Purchased Location;

m)      all of Sellers' recipes; methods; procedures; cooking/preparation/mixing publications; guidelines or standards; knowhow; ingredient lists; menus; price lists; nutritional, health, or dietary information; publications or disclosures; and promotional or informational materials, in each case whether related to food, beverages, or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes");

n)      all books, records, files, and papers of Sellers relating to: (i) the Business except to

the extent the same constitutes an Excluded Asset; (ii) the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records, and other similar documents and records (all in the state in which such records and information currently exist); or (iii) the Transferred Employees (to the extent the Transferred Employee consents to such transfer), provided that Sellers are entitled to retain copies of such books, records, files, and papers;

o)    except for Excluded Assets set forth in <u>Section 2.2</u>, all other assets related specifically to a Purchased Location;

p)    Avoidance Actions and all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation, and all other rights of any kind of Sellers arising under any provision of the Bankruptcy Code, applicable state law, or otherwise, whether asserted or unasserted—and the proceeds thereof—related to Assigned Agreements or counterparties thereto (including franchisees and Franchise Agreements), vendors and service providers used in the Business as set forth on Schedule 2.1(p), and any Tax Claims that are Assumed Liabilities. For the avoidance of ambiguity, Sellers' claims against statutory or non-statutory Insiders are not Purchased Assets;

q)    All Accounts Receivable, tax credits and or refunds, and all state unemployment tax history and rates; and

r)    All employment contracts of Transferred Employees.

2.2.    <u>**Excluded Assets.**</u> Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets do not include any assets, properties, or rights not specifically identified in <u>Section 2.1</u>, including the following (the "<u>Excluded Assets</u>"):

a)    all of Sellers' cash and cash equivalents on hand or in banks or other financial institutions (including all undeposited checks) and all short-term marketable securities, but excluding Store-Level Cash as set forth in <u>Section 2.1(b)</u>;

b)    deposits of any kind or nature whatsoever, other than as set forth in <u>Section 2.1(i) and 2.1(j)</u>;

c)    D&O insurance policies and other insurance policies and claims arising under such policies prior to the Closing, condemnation proceedings, warranty claims as well as credits, premium refunds, proceeds, causes of actions, or rights thereto, other than as set forth in <u>Section 2.1(e)</u> or <u>Section 7.7</u>;

d)    Sellers' claims against statutory or non-statutory Insiders and other Avoidance

Actions, claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation, and rights, other than as set forth in <u>Section 2.1(p)</u>;

e) Sellers' corporate seals, stock record books, minute books, and organizational documents;

f) all Non-Assigned Agreements;

g) all rights of Sellers arising under this Agreement or in connection with the Transactions;

h) all amounts owed to any Seller by any one or more of such Seller's Affiliates or any statutory or non-statutory Insider of a Seller (including the other Sellers);

i) any shares of stock or other equity interests in any of Sellers;

j) all Inventory not included in <u>Section 2.1(c)</u>;

k) all tangible personal property not included in <u>Section 2.1(d)</u>;

l) all Permits not included in <u>Section 2.1(f)</u>;

m) all Improvements not included in <u>Section 2.1(k)</u>;

n) all telephone and facsimile numbers, email addresses, URLs, and social media accounts that are not included in <u>Section 2.1(l)</u>;

o) all books, records, files and papers of Sellers not included in <u>Section 2.1(n)</u>;

p) all assets listed on <u>Schedule 2.2(p)</u>;

q) any information, documents, or materials of any kind that are (i) subject to attorney-client or attorney-client work product or similar privileges (including, for the avoidance of doubt, any of the foregoing that relate to the negotiation of this Agreement or the preparation for the filing of the Bankruptcy Cases) (collectively, "<u>Privileged Matter</u>"), or (i) subject to third party privacy rights that preclude their transfer; and

r) all assets, properties and/or rights of Sellers not otherwise specifically included in the Purchased Assets.

2.3. **<u>Assumed Liabilities.</u>** Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform, and discharge, promptly when payment or performance is due or required, only the following liabilities and obligations of Sellers or the Business (the "<u>Assumed Liabilities</u>"):

a)      all Claims, liabilities, and obligations related to or arising in connection with the Purchased Assets to the extent related to events, circumstances, and conditions arising after the Closing and to be performed solely after the Closing;

b)      all liabilities and obligations of Sellers related to or arising under Permits included within the Purchased Assets to the extent related to events, circumstances, and conditions arising after the Closing and to be performed solely after the Closing;

c)      all liabilities and obligations of Sellers related to or arising under the Assigned Agreements that are required to be performed after the Closing Date;

d)      any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assigned Agreements (as contemplated by Section 365 of the Bankruptcy Code);

e)      Actual Cure Costs with respect to Assigned Agreements that are Real Property Leases, including allowed administrative claims for "stub rent" pursuant to Section 363 of the Bankruptcy Code;

f)      Actual Cure Costs with respect to Assigned Agreements that are Contracts, including liabilities with respect to allowed claims arising under Section 503(b)(9) of the Bankruptcy Code;

g)      up to $2,800,000 with respect to allowed claims arising under Section 503(b)(9) of the Bankruptcy Code to the extent such claims do not constitute Actual Cure Costs;

h)      all liabilities with respect to "trust fund" sales and payroll taxes that are outstanding as of the Closing with respect to the Purchased Assets up to $6,215,000;

i)      all liabilities with respect to allowed Claims that are secured by PACA Liens and that are outstanding as of the Closing up to $376,000;

j)      post-petition accounts payable outstanding as of the Closing up to $300,000;

k)      accrued payroll from June 12, 2023 through Closing up to $400,000;

l)      as set forth in Section 7.9 and Section 7.10, all Transfer Taxes and Property Taxes that are attributable to the Purchased Assets and that are not Excluded Liabilities;

m)      all obligations for gift cards issued for the use of the Sellers' customers for dining or making purchases at the Sellers' restaurant locations and obligation under customer loyalty program of Sellers that incentivize customers to return to the Sellers' restaurants by providing coupons and/or discounts (excluding any escheatment claims);

n)      The Transaction Fee up to $1,000,000.

2.4.    **Excluded Liabilities.** Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or Liability of Sellers of whatever nature, whether presently in existence or arising hereafter. All such other Claims and Liabilities not being assumed (the "Excluded Liabilities") will be retained by and remain the sole Liabilities of Sellers, including, without limitation, the following specific Excluded Liabilities:

a)      all Liabilities of Sellers, except Assumed Liabilities, of every kind whether or not asserted, scheduled, or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Bankruptcy Cases, secured, priority, administrative or unsecured, in each case, accrued prior to, on, or after the Petition Date;

b)      all Liabilities of the Sellers under any Contract or Real Property Lease of the Sellers that is not an Assigned Agreement whether accruing prior to, at, or after the Closing Date except as set forth in Section 2.3(g), 2.3(i) and Section 2.3(j) and Section 2.3(m);

c)      all Liabilities of the Sellers relating to any WARN Act compliance or any violations or alleged violations thereof, including any obligations related or attributable thereto, and all Liabilities under any valid policy or practice that provides for a severance payment to terminated employees of the Seller;

d)      any and all liabilities relating to or arising from any non-Transferred Employees..

2.5.    **Assumption/Assignment of Contracts and Rights.** To the maximum extent permitted by the Bankruptcy Code, the Assigned Agreements will be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code. Purchaser is solely responsible for paying any Actual Cure Costs due in connection with the assumption and assignment of the Assigned Agreements. Notwithstanding any other provision of this Agreement to the contrary, this Agreement constitutes an agreement to assign all Assigned Agreements and rights thereunder unless a third party objects to the assignment and it is determined by the Bankruptcy Court that the Sellers are incapable as a matter of law of assigning that particular Contract or Real Property Lease.

2.6.    **Purchase Price; Allocation of Purchase Price.**

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment, and conveyance of the Sellers' rights, title, and interest in, to, and under the Purchased Assets shall consist of:

a)      Cash in the amount of: (i) $12 Million Dollars ($12,000,000), which amount will be reduced by the amount of the Good Faith Deposit delivered to Sellers as a credit against the Purchase Price in accordance with <u>Section 2.9(a)</u>; (ii) plus the Estimated Wind Down Expenses of up to $150,000; and (iii) the Prepaid Rent Adjustment of up to $870,000; and

b)      The assumption by Purchaser of the Assumed Liabilities from Sellers.

2.7.    **Allocation of Purchase Price.** Purchaser and Sellers agree that the Purchase Price, Assumed Liabilities, and other relevant items will be allocated in accordance with Section 1060 of the Code and the regulations thereunder and <u>Schedule 2.7</u> hereof (such schedule to be determined jointly by Purchaser and Sellers prior to Closing). Purchaser and Sellers agree promptly to provide the other with any additional information required to complete <u>Schedule 2.7</u>. Such allocation will be binding on Purchaser and Sellers for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the parties hereto agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations.

2.8.    **Adjustment of Purchase Price.**

a)      Within three Business Days prior to the Closing, the Sellers will deliver to Purchasers an estimate, in each case assuming that all of the Designation Rights Assets will ultimately become Purchased Assets, of: (i) the Transfer Taxes that will be payable upon the consummation of the Transactions at each Purchased Location (the "<u>Transfer Tax Estimate</u>"), and the pro-rated Property Taxes payable at each of the Purchased Locations based upon 2022 Property Tax bills or more current bills if available (the "<u>Property Tax Estimate</u>"); and (ii) the amount of monthly rent provided for under each applicable Real Property Lease that the Sellers have prepaid at each of the Purchased Locations based upon the number of days of the month prior to Closing and the number of days of the month that remain after the Closing up to $870,000 (the "<u>Prepaid Rent Adjustment</u>"). Each of the calculations required by this Section 2.8(b) will be done on a location-by-location basis, with each amount attributable to Designation Rights Assets clearly marked as such. The Sellers and the Purchaser will work in good faith to address any objections that they may have to the foregoing amounts prior to Closing.

b)      At the Closing, cash in the amount of $1,000,000 from the Purchase Price will be deposited with the Escrow Agent (the "<u>Adjustment Escrow Amount</u>"). The Adjustment Escrow Amount will be held and disbursed by the Escrow Agent solely for the purpose of paying any adjustments required pursuant to this Section 2.8

in accordance with the terms of this Agreement and the Escrow Agreement. For the avoidance of doubt, it is expressly understood by the Parties that the total combined obligation of Purchaser or Seller for any adjustments due to reconciliations or "true-ups" as described in this Section 2.8 shall not exceed the $1,000,000 Adjustment Escrow Amount.

c)    Within one hundred twenty (120) days after the Closing Date, Purchaser will cause to be prepared, at Purchaser's expense, a reconciliation of the and Transfer Taxes, the Property Taxes, and the Prepaid Rent Adjustment (together with supporting calculations in reasonable detail, the "<u>Final True-Up Statement</u>") that will show the amount of such expenses payable by Sellers and the amount payable by the Purchaser (the "<u>Final True-Up</u>"). Upon completion of such statement, Purchaser will deliver the Final True-Up Statement to Sellers.

d)    If the Final True-Up, as set forth on the Final True-Up Statement as conclusively determined as forth in Section 2.8(e) (the True-Up as so determined, the "Certified True-Up"), provides that the Sellers owe the Purchaser with respect to Purchased Assets, either conveyed on the Closing Date or during the Designation Rights Term, then Purchaser and the Sellers will promptly (but in any event within five (5) Business Days of the later of the final determination thereof and the termination of the Designation Rights Asset Term) jointly instruct the Escrow Agent to release to Purchaser by wire transfer of immediately available funds to such accounts designated by Purchaser, the lesser of (i) the amount which the Certified True-Up provides the Sellers owe and (ii) the Adjustment Escrow Amount. If the amount payable to Purchaser pursuant to this Section 2.8(f) is less than the Adjustment Escrow Amount, then Purchaser and the Sellers will (at the same time that the Escrow Agent is instructed to release funds to Purchaser pursuant to this Section 2.8(f)), execute and deliver to the Escrow Agent a joint written instruction directing the Escrow Agent to pay the balance of the Adjustment Escrow Amount to the Sellers by wire transfer of immediately available funds to such accounts designated by the Sellers.

e)    If the Certified True-Up shows that the Purchaser owes the Sellers with respect to Purchased Assets, either conveyed on the Closing Date or during the Designation Rights Term, then Purchaser will pay to Sellers out of the Adjustment Escrow Amount an amount not to exceed such Adjustment Escrow Amount, and Purchaser and the Sellers will promptly (and in any event within five (5) Business Days of the later of such final determination thereof and the termination of the Designation Rights Asset Term) deliver to the Escrow Agent a joint written instruction instructing the Escrow Agent to release the entire Adjusted Escrow Amount to the Sellers.

f)    Unless Sellers notify Purchaser in writing within thirty (30) days after receipt by Sellers of the Final True-Up Statement of any objections thereto (specifying in

reasonable detail the basis therefor), such statement will be final and binding for all purposes. If Sellers timely notify Purchaser of any such objection, Purchaser and Sellers will attempt in good faith to reach an agreement as to the matter in dispute. If the Parties fail to resolve any such dispute within ten (10) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or Sellers, be submitted to and determined by the Bankruptcy Court. The Final True-Up Statement will, after resolution of any dispute pursuant to this Section 2.8(h), be final, binding, and conclusive on all Parties hereto.

2.9.  **Good Faith Deposit.**

a)    Contemporaneously with the execution of this Agreement, Purchaser and Sellers will execute the Escrow Agreement and Purchaser will deposit with the Escrow Agent cash in immediately available federal funds by wire transfer to an account designated by the Escrow Agent an amount equal to Three Million Two Hundred and Six Thousand and One Hundred Dollars ($3,206,100.00) (the "Good Faith Deposit"). The Good Faith Deposit will be held in escrow by the Escrow Agent in an interest-bearing bank account approved by Purchaser. The Escrow Agreement shall provide that such funds will be returned to the Purchaser if the order approving bidding protections (the "Bidding Protections Order") is not approved by the Bankruptcy Court on or before May 24, 2023.

b)    The Parties will cause the Escrow Agent to disburse the Good Faith Deposit and interest earned thereon to Sellers (i) at the Closing as a credit against the Purchase Price, (ii) if this Agreement is terminated pursuant to Section 11.1(e), or (iii) if this Agreement is terminated pursuant to Section 11.1(b) and any of the conditions of Section 9.3 have not been satisfied. Except as described in the previous sentence, the Parties will cause the Escrow Agent to return the Good Faith Deposit to Purchaser within five (5) Business Days after any termination of the Agreement pursuant to Section 11.1.

c)    If Purchaser is the successful bidder but Closing (as defined below) does not occur and Sellers believe that Purchaser is at fault, Sellers' sole remedy is to pursue retention of the Good Faith Deposit, and the maximum amount of damages Sellers may be entitled to is the amount of the Good Faith Deposit.

2.10.  **Closing.** The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities will take place at the offices of Culhane Meadows PLLC, 3441 Silverside Road, Wilmington, Delaware, on a date designated by Sellers no later than five (5) Business Days after satisfaction of the conditions set forth in Section 9 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Sellers may agree; provided that the Closing must occur on or before June 14, 2023.

2.11.  **Deliveries by Sellers.** At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

a)  a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Sellers;

b)  originals (or, to the extent originals are not available, copies) of all Assigned Agreements (together with all material amendments, supplements, or modifications thereto) to the extent not otherwise already made available to the Purchaser through the Sellers' datasite;

c)  physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets will pass by and upon delivery;

d)  a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

e)  an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Laws issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

f)  a certificate executed by an executive officer of each Seller to the effect that all of the conditions to closing set forth in Section 9.2 have been fulfilled;

g)  certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

h)  all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

2.12.  **Deliveries by Purchaser.** At the Closing, Purchaser will deliver or cause to be delivered to Sellers (unless previously delivered) the following:

a)  the Cash component of the Purchase Price as set forth in Section 2.6(a) (including the Prepaid Rent Adjustment and Estimated Wind Down Expenses), <u>less</u> the Good Faith Deposit and delivered to Sellers at Closing;

b)  the Assignment and Assumption Agreement, duly executed by Purchaser;

c)  a letter instructing the Escrow Agent to release the Good Faith Deposit to Sellers, duly executed by Purchaser;

d)      all other documents, instruments, and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

2.13.   **Bulk Sales Laws.** Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

**3.**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

3.      **Representations and Warranties of Sellers**. Subject to the terms, conditions and limitations set forth in this Agreement, Sellers hereby jointly and severally represent and warrant to Purchaser as of the date of this Agreement as follows:

3.1.    **Organization.** Each Seller is an entity validly existing under the Laws of the jurisdiction listed for such Seller in the Preamble, and has the power and authority to own, lease, and operate the Purchased Assets and to carry on in all material respects the Business as now being conducted.

3.2.    **Due Authorization.** The execution, delivery, and performance by Sellers of this Agreement and the consummation of the Transactions are within Sellers' powers and have been duly authorized by all necessary actions on the part of Sellers. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Sellers that is enforceable in accordance with its terms.

3.3.    **Governmental Authorization.** Except as disclosed on Schedule 3.3, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

3.4.    **Noncontravention.** Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases, the execution, delivery, and performance by Sellers of this Agreement and the consummation of the Transactions do not and will not: (a) violate any Seller's organizational documents; (b) assuming compliance with the matters referred to in Section 3.3, materially violate any applicable Law; (c) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation, or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which any Seller is entitled under any provision of any Contract or Real

Property Lease binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code; or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

3.5.    **Required Consents.** Except for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on <u>Schedule 3.5</u>, there is no Contract binding upon Sellers requiring a consent or other action by any Person as a result of the execution, delivery, and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

3.6.    **Litigation.** Except as disclosed on <u>Schedule 3.6</u>, as of the date hereof, there is no action, suit, investigation, or proceeding pending against, or to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets before any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the Transactions.

3.7.    **Permits.** To the Knowledge of Sellers, <u>Schedule 3.7</u> sets forth a complete and correct list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Sellers. Except as set forth on <u>Schedule 3.7</u>, to the Knowledge of Sellers, (a) each Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and, to the Knowledge of Sellers, no proceeding is pending seeking to revoke or limit any such Permit.

3.8.    **Intellectual Property Rights.** <u>Schedule 3.8(a)</u> sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets. Except as set forth on <u>Schedule 3.8(b)</u>, to the Knowledge of Sellers, there exist no outstanding challenges to the ownership and use by Sellers of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties. Except as set forth on <u>Schedule 3.8(b)</u>, none of the Intellectual Property Rights included in the Purchased Assets have been licensed by Sellers to any other Person.

3.9.    **Compliance with Laws and Court Orders.** To the Knowledge of Sellers, no Seller is in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

3.10.    **Environmental Matters.** Other than as may be set forth in the reports described on <u>Schedule 3.10</u>, Sellers have not received written notice from any Governmental Authority or third

party of any violation of or failure to comply with any Environmental Laws with respect to the Leased Real Property which to the Knowledge of Sellers remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property which to the Knowledge of Sellers remains unperformed.

**3.11. <u>Employee Benefit Plans</u>.**

a) <u>Schedule 3.11(a)</u> sets forth a complete and accurate list of Sellers' Employee Benefit Plans. Sellers have provided to, or made available to, Purchaser true and correct copies of each Employee Benefit Plan (including all plan documents and amendments thereto). Except as set forth on <u>Schedule 3.11(a)</u>, to the Knowledge of Sellers, each Employee Benefit Plan has been established, maintained, funded, and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws. Except as set forth on <u>Schedule 3.11(a)</u>, to the Knowledge of Sellers, each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and to the Knowledge of Sellers nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan. No Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, and no Seller or any ERISA Affiliate contributes to or has any liability with respect to any such plan.

b) No Seller or ERISA Affiliate is a party to any Multiemployer Plan. As of the date of this Agreement, no Seller or ERISA Affiliate has incurred any unsatisfied withdrawal liability with respect to any Multiemployer Plan, and no Seller or ERISA Affiliate is bound by any contract or any liability described in Section 4204 of ERISA. Except as set forth on <u>Schedule 3.11(b)</u>, with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements, or accruals for all periods (or partial periods) ending prior to or as of the Closing Date will have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

c) None of the Sellers nor any of their ERISA Affiliates have any obligations under any Employee Benefit Plan with respect to which the Purchaser or any of its ERISA Affiliates would have any liability or obligation.

**3.12. <u>Personnel Matters</u>.** Sellers have provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, base compensation, and any supplemental or bonus compensation (including any retention bonus arrangements) for all salaried employees of any Seller. To the Knowledge of Sellers and except as to matters which would not reasonably be

expected to have a Material Adverse Effect, all Sellers are currently complying and have for the past 5 years complied with all Employment-Related Laws and Obligations, which means all Laws and Orders of any Governmental Authority relating to, touching upon or concerning the employment of the employees who perform work in connection with the operation of the Business—including relating to the hiring, firing, and treatment of employees—or any legal obligation or duty regarding employment practices, terms, and conditions of employment, equal opportunity, non-discrimination, discharge, immigration, anti-harassment, anti-retaliation, whistle blowing, compensation, wages, overtime payments, hours, benefits, collective bargaining, income tax withholding, the payment of Social Security and other similar taxes, pension plans, the modification or termination of benefit plans and retiree health insurance plans, policies, programs, agreements, occupational safety and health, workers compensation or other similar benefits and payments on account of occupational illness and injuries, employment contracts, collective bargaining agreements, grievances originating under the collective bargaining agreements, wrongful discharge, torts such as invasion of privacy, infliction of emotional distress, defamation, and slander (hereinafter "<u>Employment-Related Laws and Obligations</u>"). Additionally, to the Knowledge of Sellers, there are no threatened or pending charges, complaints, demands, lawsuits, or petitions against, or investigations being conducted of any Sellers concerning or relating to any alleged violations of, or failure to comply with, any Employment-Related Laws and Obligations, except as set forth on <u>Schedule 3.12</u>, except for such matters that would not have a Material Adverse Effect. To the Knowledge of Sellers, there are no, and there has not occurred during the past 5 years, any union organizing campaigns or certification or representation demands or proceedings or campaigns that relate to the Business or any person or entity performing services for any Seller and no such action or activity has been threatened. No individuals or groups of individuals performing services for, on, or in connection with the Business are represented by a labor union or covered by a collective bargaining agreement, and no collective bargaining agreement, card check or recognition agreement, or any other agreement or arrangement with any labor union affects the operation of any Purchased Asset or any employees of Sellers. There are no existing or, to the Knowledge of Sellers, threatened labor strikes, lockouts, walkouts, work stoppages, organized slowdowns, unfair labor practice charges or complaints, labor arbitration proceedings affecting or relating to any employees of Sellers or the Purchased Assets and no Seller has experienced any such event within the past 5 years.

3.13.   **Sufficiency of and Title to the Purchased Assets.** Sellers will have at Closing good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets. Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid, and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and

clear of all Liens (other than Assumed Liabilities and Permitted Liens) to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code.

3.14.    **Real Property.**

a)    The Leased Real Property constitutes all real property used by Sellers in connection with the Business.

b)    Except as set forth on Schedule 3.14(b), to the Knowledge of Sellers, none of the Leased Real Property is subject to an eminent domain or condemnation proceeding.

c)    The Sellers do not own any real property in fee.

d)    Schedule 3.14(d) lists each Real Property Lease. The Sellers have delivered (or otherwise made available) to the Purchaser a correct and complete copy of each Real Property Lease, together with all amendments thereto.

e)    Except as set forth on Schedule 3.14(e), Sellers have a valid, binding, and enforceable leasehold interest under each of the Real Property Leases under which any Seller is a lessee, free and clear of all Liens other than Permitted Liens. Sellers have all certificates of occupancy and Permits of any Governmental Authority necessary or useful for the current use and operation of each Leased Real Property, and Sellers have fully complied with all material conditions of the Permits applicable to them. Except as to matters which would not reasonably be expected to have a Material Adverse Effect and except as set forth on Schedule 3.14(e), no default, violation, or event that with the lapse of time or giving of notice or both would become a default or violation has occurred in the due observance of any Permit.

f)    Sellers have not received any notice from any insurance company that has issued a policy with respect to any Leased Real Property requiring performance of any structural or other repairs or alterations to such Leased Real Property. Sellers do not own or hold, nor is any Seller obligated under or a party to, any option, right of first refusal, or other contractual right to purchase, acquire, sell, assign, or dispose of any real estate or any portion thereof or interest therein, except as may be set forth under the Real Property Leases.

3.15.    **Contracts.**

a)    Schedule 3.15 lists the following Contracts and Real Property Leases (all Contracts or Real Property Leases listed or required to be listed herein are referred to as "Material Contracts") as of the date of this Agreement:

i.    all Real Property Leases;

ii.     all Franchise Agreements;

iii.    all employment, confidentiality, and/or noncompetition Contracts with employees of any Seller and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business;

iv.     all Contracts under which any Seller leases personal property in connection with the Business;

v.      all Contracts with any material supplier of the Business;

vi.     all Contracts that provide for payments in excess of $100,000 over a 12-month period;

vii.    all Contracts with any Governmental Authority related to the Business; and

viii.   all other Contracts that are material to the operation of the Business and not previously disclosed pursuant to this Section 3.15.

b)      Except as to matters which would not reasonably be expected to have a Material Adverse Effect and except as set forth on Schedule 3.15(b), each of the Material Contracts is in full force and effect and is the legal, valid, and binding obligation of the applicable Seller and of the other parties thereto, enforceable against each of them in accordance with its terms and, upon consummation of the Transactions, will continue in full force and effect without penalty or other adverse consequence. Except as set forth on the *Notice of Possible Assumption and Assignment with Respect to Executory Contracts and Unexpired Leases of the Debtors* [Dkt. No. 418], as it may be amended or supplemented from time to time: (i) no Seller is in default under any Material Contract, nor, to the Knowledge of Sellers, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by any Seller or any other party thereunder; and (ii) and no party has given notice of any significant dispute with respect to any Material Contract. Sellers have and will transfer to Purchaser at the Closing, good and valid title to the Assigned Agreements, free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule 3.15(b), Sellers have delivered to Purchaser true, correct, and complete copies of all of the Material Contracts, together with all amendments, modifications, or supplements thereto.

3.16.   **Certain Fees.** Except for the Transaction Fee for which Purchaser will be responsible for payment, in cash, Sellers have not incurred any liability for any investment banking fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

3.17. **Privacy Policy.** Seller shall comply with the Corner Bakery Privacy Policy dated December 27, 2019 and the Special Privacy Notice for California Residents dated December 27, 2019 (the "Privacy Policy") and represents and warrants that with respect to information subject to the Privacy Rights of California (the "CCPA") Seller shall not and hereby does not transfer, sell, or convey any "personal information" of California residents to Buyer for any Person who has (i) opted out of the sale, transfer or conveyance of such personal information or (ii) has previously requested that Seller delete such personal information (subject to exceptions under the CCPA or other applicable law).

3.18. **Accuracy of Schedules**. To the Knowledge of Sellers, all Schedules annexed to this Agreement are true and accurate.

3.19. **"AS IS" TRANSACTION.** PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS SECTION 3, THE CONSENT OF A PARTY TO THE CLOSING WILL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

DocuSign Envelope ID: 7DAFDED8-394B-4E7D-B9A5-32D751BA0911

ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**4.**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

4.    **Representations and Warranties of Purchaser**.  Purchaser represents and warrants to Sellers as follows:

4.1.    **Organization.** Purchaser is a limited liability company duly organized, validly existing, and in good standing under the Laws of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents, and approvals required to carry on its business as now conducted.

4.2.    **Corporate Authorization.** The execution, delivery, and performance by Purchaser of this Agreement and the consummation of the Transactions are within the corporate powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3.    **Governmental Authorization.** The execution, delivery, and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than: (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the actions and filings required pursuant to Section 7.8; and (c) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

4.4.    **Noncontravention.** Neither the execution and delivery of this Agreement nor the consummation of the Transactions will: (a) conflict with or result in any breach of any provision of the organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation, or acceleration under, any of the terms, conditions, or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease, or other contract, instrument, or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults, or rights (i) which would not adversely affect the

ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Sellers.

4.5.    **Financing.** Purchaser has sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    **Litigation.** There is no action, suit, investigation, or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the Transactions.

4.7.    **Certain Fees.** Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    **Inspections; No Other Representations.** Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder. Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Purchaser acknowledges that Sellers have given Purchaser reasonable and open access to the key employees, documents, and facilities of the Business. Purchaser acknowledges and agrees that the Purchased Assets are being sold on an "as is, where is" basis and Purchaser agrees to accept the Purchased Assets and the Assumed Liabilities in the condition they are in on the Closing Date based on its own inspection, examination, and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Sellers, except as expressly set forth in this Agreement. Without limiting the generality of the foregoing, Purchaser acknowledges that Sellers make no representation or warranty with respect to: (a) any projections, estimates, or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business, or the future prospects or operations of the Business; or (b) any other information or documents made available to Purchaser or its counsel, accountants, or advisors with respect to the Business, except as expressly set forth in this Agreement.

4.9.    **Privileged Matters.** Purchaser acknowledges and agrees that any transfer, conveyance, disclosure, or delivery (including on any servers included in the Purchased Assets) of any Privileged Matter is entirely inadvertent and unintentional and shall neither be construed as, nor constitute, a waiver, modification, limitation, or impairment of the privileged or protected nature of such Privileged Matter, and (ii) any Privileged Matter inadvertently held by the Buyer shall, at the request of Seller, be transferred to Seller.

**5.**
**COVENANTS OF SELLERS**

5.    <u>**Covenants of Sellers**</u>. Sellers agree that:

5.1.    <u>**Conduct of the Business.**</u> From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, except: (a) as disclosed on <u>Schedule 5.1</u>, (b) as may be required by the Bankruptcy Court, (c) for the consequences resulting from the continuation of the Bankruptcy Cases, or (d) as may be required or contemplated by this Agreement, each Seller will conduct, and will cause its Affiliates to conduct, the Business and maintain the Purchased Assets in the ordinary course and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Purchaser otherwise consent in writing, each Seller will, and will cause each of its respective Affiliates to, do the following:

a)    pay all post-petition bills and invoices for post-petition goods or services promptly when due;

b)    notify Purchaser of any material adverse change in its condition (financial or otherwise), business, properties, assets or liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

c)    maintain in the ordinary course customary amounts of cash, cash equivalents, and similar cash items at the location of each restaurant in cash registers, safes, strongboxes, and lock boxes consistent with past practice;

d)    use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits necessary or required by Law to own, lease and operate its respective properties (and the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the

Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date (or 60 days thereafter);

e)     maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers as of the Petition Date; and

f)     maintain its gift card programs in the ordinary course of business and offer gift cards for sale without discount and consistent with past practice.

5.2.    **Certain Restricted Conduct.** Except as set forth on Schedule 5.2 and except as otherwise set forth in this Agreement or as Purchaser otherwise consents in advance in writing, during the period from the date of this Agreement to the Closing, no Seller will, and each Seller will cause each of its respective Affiliates not to, with respect to the Purchased Assets:

a)     sell, lease, license, transfer, or dispose of other than in the ordinary course of business, any Purchased Assets;

b)     authorize or enter into any Contract, arrangement, or commitment other than a Contract that is both: (i) in the ordinary course of business; and (ii) not a Contract that would constitute a Material Contract if it were effective as of the date of this Agreement;

c)     dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property Right,

d)     other than in the ordinary course, authorize, undertake, make, or enter into any commitments obligating any Seller to: (i) make or accelerate any capital expenditures; or (ii) undertake to approve any material renovation or rehabilitation of any Leased Real Property;

e)     except for increases in annual compensation of no more than $5,000 per non-executive employee of the Sellers or as required by applicable Law or existing Contract: (i) increase any compensation or enter into or amend any employment or other agreement with any of its officers, directors or employees; (ii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan, except for changes which are required by Law and changes which are not more favorable to participants than provisions presently in effect; (iii) hire any employee or individual independent contractor with annual compensation in excess of $75,000 (except to the extent such hire is in replacement of an existing employee with comparable compensation) or enter into any new employment agreements that would result in post-termination payments that in the aggregate would exceed $5,000 becoming due or payable upon termination of employment or of the individual independent contractor; or

(iv) assume or enter into any labor or collective bargaining agreement relating to the Business, any employee, or any Purchased Asset;

f)     take any action that would constitute or result in an event of default under any debtor-in-possession financing facility agreement or order and/or cash collateral agreement;

g)     permit, offer, agree, or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens, Liens existing on the date of this Agreement and Liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

h)     do any other act that would, to the Knowledge of Sellers, cause any representation or warranty of any Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

i)     authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

j)     No Seller nor any of its Affiliates will: (i) except pursuant to any Order governing the use of cash collateral entered by the Bankruptcy Court in the Bankruptcy Cases, voluntarily, by operation of law, or otherwise, renew, assign, transfer, sublease, mortgage, pledge, hypothecate or otherwise encumber any lease or the leasehold estate constituting a portion of the Business upon which Purchaser, Seller or an Affiliate of either has any continuing financial or other obligation (contingent or otherwise) except for Permitted Liens; (ii) renew any lease nor suffer any person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Purchaser, which consent will not be unreasonably withheld or (iii) terminate, amend, extend, renew, modify, breach, waive or allow any rights to lapse under any Material Contract (except to the extent such Material Contract expires by its own terms and is not a Real Property Lease identified on Schedule 5.2 hereto). If Sellers request such a consent from Purchaser, the request must be in writing specifying the terms of the renewal; the identity of the proposed assignee or sub-lessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder. Such request for Purchaser consent must be submitted to Purchaser at least three (3) days in advance of the date on which Seller's desire to make such event occur.

5.3.     **Access to Information.** From the date hereof until the earlier of the termination of this Agreement pursuant to Section 11.1 or the Closing Date, Sellers will reasonably afford, and will cause their officers, employees, attorneys, and other agents to reasonably afford, to Purchaser

and its counsel, accountants, and other representatives, access (at reasonable times during normal business hours) to officers and other employees of Sellers for the purposes of evaluating the Business and all corporate offices, restaurants, warehouses or other facilities, properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement. All access to the officers, employees, properties, restaurants, books, accounts, records and/or documents of the Business will be arranged on behalf of Sellers by the Sellers' Chief Restructuring Officer or his agents and representatives. Subject to the limitations set forth in the Real Property Leases, Purchaser and its representatives will have the right to conduct environmental and engineering inspections at the Leased Real Property and, subject to Purchaser providing Sellers with prior written notice and offering Sellers the opportunity to participate, each Seller and its Affiliates will reasonably cooperate with and assist Purchaser in carrying out such inspections; provided, however, that in no event will Purchaser be allowed to conduct any Phase II environmental investigation at the real estate leased by Sellers. No investigation pursuant to this <u>Section 5.3</u> will alter any representation or warranty given hereunder by any Seller. The Sellers will use commercially reasonable efforts to assist the Purchaser in its contacts with any counterparty to any Assigned Agreement or Designation Rights Asset. Each Seller, at the sole cost and expense of Purchaser, will cause its personnel and representatives, including those with Knowledge of Sellers of any and all matters described above, to cooperate fully with the Purchaser and its representatives, accountants and counsel in connection with the Purchaser's investigation.

5.4.    **Notices of Certain Events.** Sellers will promptly notify Purchaser of and deliver copies to Purchaser of:

   a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

   b)    any material written communication from any Governmental Authority in connection with or relating to the Transactions and any condemnation or eminent domain event affecting any of the Purchased Locations;

   c)    any correspondence, report or notice required to be given by the Sellers to any party under a debtor-in-possession financing facility agreement or order, and/or cash collateral agreement or order, or any other related document, including any variance reports, weekly budget compliance reports, or notice of default;

   d)    the commencement of any actions, suits, investigations, or proceedings relating to Sellers or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 3.6</u>.

5.5.    **Change of Seller's Name.**

a)      Prior to the Closing, Sellers will deliver to Purchaser duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of each Seller's organizational documents (collectively, the "Organizational Amendments") changing each Seller's name to another name that does not include any of the following words: "Corner Bakery" or "Corner." Each Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendments with the applicable Secretary of State (or equivalent) of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business on each such Seller's behalf; provided that such Organizational Amendments may not be filed prior to the date that is three Business Days after the Closing Date.

b)      Subject to Sellers' obligations under Section 7.5 with respect to Designation Rights Assets, within three Business Days after the Closing, each Seller will discontinue the use of its current name (and any other trade name or d/b/a currently utilized by any Seller) and will not subsequently change its name to or otherwise use or employ any name that includes the words "Corner Bakery" or "Corner" without the prior written consent of Purchaser. From and after the Closing, each Seller covenants and agrees not to use or otherwise employ any trade name, corporate or entity name, d/b/a or similar Intellectual Property Right or attribute previous utilized by any Seller or thereafter utilized by Purchaser in the conduct of the Business, which rights will be included in the Purchased Assets purchased hereunder.

**6.**
**COVENANTS OF PURCHASER**

6.      **Covenants of Purchaser**. Purchaser agrees that:

6.1.    **Confidentiality.** Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement will remain in full force and effect. After the Closing has occurred, the Confidentiality Agreement will be terminated to the extent relating to the Purchased Assets, Assumed Liabilities and the employees of Sellers, and will, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

6.2.    **Access.** On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Sellers and their counsel, advisors, and other agents reasonable access during normal business hours to Purchaser's books and records relating to the Purchased Assets to the extent necessary for financial reporting and accounting matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim, or assessment, the reconciliation of Claims in the Bankruptcy Cases, to permit Sellers to determine any matter relating to their rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues

arising in connection with or relating to the Bankruptcy Cases; *provided, however*, that any such access by Sellers will not unreasonably interfere with the conduct of the business of Purchaser. Sellers will hold, and will use their commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 6.2.

6.3.    **Payment of Transaction Fee.** Notwithstanding anything herein to the contrary, upon the occurrence of Closing and the purchase of the Assets by the Purchaser, the Purchaser will pay, in cash, and satisfy the Transaction Fee.

**7.**
**COVENANTS OF PURCHASER AND SELLERS**

7.    **Covenants of Purchaser and Sellers**. Purchaser and Sellers agree that:

7.1.    **Efforts; Further Assurances.** Subject to the terms and conditions of this Agreement, Purchaser and Sellers will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions contemplated by this Agreement; provided, however, Sellers will be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases. Sellers and Purchaser agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.2.    **Certain Filings.** Sellers and Purchaser will cooperate with one another in good faith: (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals, or waivers are required to be obtained from parties to any Assigned Agreements or Intellectual Property Rights, in connection with the consummation of the Transactions; and (b) in taking such actions or making any such filings, furnishing information required in connection therewith, and seeking timely to obtain any such actions, consents, approvals, or waivers.

7.3.    **Public Announcements.** Purchaser will not make any public announcements or statements concerning the Transactions without the prior written consent of Sellers and Sellers will provide Purchaser with a copy of and an opportunity to comment on any press releases filed by the Sellers or their Affiliates concerning the Transactions provided that Purchaser will provide any comments within one (1) Business Day of receipt of same. Purchaser acknowledges and

agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom Sellers determine it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases. Sellers also will be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and will be entitled to publish notice of the contemplated Transactions in any newspaper selected by Sellers.

7.4.    **Bankruptcy Issues.**

a)    **Stalking Horse Notice and Motion**. Within one Business Day following execution of this Agreement, Sellers shall: (i) file and serve a "Stalking Horse Notice" and provide contract and lease counterparties with all information required pursuant to the Bidding Protections Order; and (ii)  file a motion with the Bankruptcy Court seeking approval of the Breakup Fee.

b)    **Breakup Fee.** Upon the approval of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a prevailing bid for the Purchased Assets, Sellers will cause the Escrow Agent to return the Good Faith Deposit to the Purchaser. Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a prevailing bid for the Purchased Assets, Sellers will pay to Purchaser a fee consisting of cash or other immediately available funds in an amount equal to: (i) 3% of the Purchase Price capped at $750,000; and (ii) Purchaser's reasonable and actual expenses in an amount not to exceed $400,000 (the "Breakup Fee"); provided, however, the Breakup Fee will not be due and payable if Purchaser has committed a material breach of this Agreement prior to the consummation of such sale to the third party. The Parties agree that the Breakup Fee and the return of the Good Faith Deposit will be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 11.1(f). The provisions of this Section 7.4(b) will survive any termination of this Agreement pursuant to Section 11.1(f). The Breakup Fee will be an allowed administrative expense claim in the Bankruptcy Cases to be paid solely from the cash proceeds of any approved sale of the Purchased Assets to a third party, will be paid to Purchaser within three Business Days following the closing of such sale to a third party, and will be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party will attach to the portion of the sale proceeds representing the Breakup Fee).

c)    **Sale Order.** (The Sale Order must be entered no later than three days after the Sale Hearing, which shall be held no later than June 1, 2023. The Sale Order must be in a form acceptable to the Purchaser in its reasonable discretion and provide, among other things, that:

i.  this Agreement is valid and enforceable;

ii.  this Agreement and the Transactions contemplated herein are approved;

iii.  on the Closing Date, the Purchased Assets will be sold to Purchaser free and clear of any and all Liens (except for Permitted Liens and the Assumed Liabilities), including any liens granted during the Bankruptcy Cases;

iv.  on the Closing Date, the Assigned Agreements will be assumed by Sellers and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code and Purchaser will pay the Actual Cure Costs due in connection with the assumption and assignment of the Assigned Agreements;

v.  all causes of actions against any counterparty to the Assigned Agreements, related in any way to the Assigned Agreements, will be forever released and waived by the Sellers. The Sellers, however, will be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Agreements;

vi.  after the Closing Date, subject to Section 7.5(d), the Purchaser will have the continuing right to review and determine whether to elect to acquire the Designation Rights Assets; and

vii.  all persons and entities, including, governmental, tax, and regulatory authorities, lenders, trade, and other creditors holding interests or claims of any kind or nature whatsoever against the Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to the Sellers, the Purchased Assets, or the operations of the Sellers prior to the Closing, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its affiliates, successors or assigns, property or the Purchased Assets such persons' or entities' interests or claims, subject to rights of parties or individuals for claims arising out of Assumed Liabilities.

d)  **Cooperation.** Sellers and Purchaser agree to use commercially reasonable efforts cooperate, assist, and consult with each other to obtain the issuance and entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

e)  **Bankruptcy Court Approval of Sale.** Sellers and Purchaser will cooperate, assist, and consult with each other and each use commercially reasonable efforts, to secure the entry of the Sale Order; *provided, however*, Sellers will be entitled to take such actions as may be required in connection with the discharge of their

fiduciary duties in the Bankruptcy Cases. In connection with the assumption and assignment of the Assigned Agreements pursuant to Section 365 of the Bankruptcy Code, Purchaser will take all actions reasonably required in the discretion of the Purchaser or otherwise as directed by the Bankruptcy Court to provide "adequate assurance of future performance" by Purchaser under the Assigned Agreements after the Closing.

7.5.   **Actual Cure Costs; Schedule Updates; Designation Rights.**

a)   The Purchaser will have ninety (90) days to elect to assume such Contracts listed in the post-Closing Contract & Cure Schedule supplement or, with respect to any Designation Rights Asset, such longer period as is allowed under this Agreement.

b)   At least one (1) Business Day prior to the Closing, the Purchaser will designate, in writing, certain contract agreements, and leases as Designation Rights Assets (the "Designation Rights Asset(s)").

c)   Prior to the Closing Date, the Sellers will seek to obtain an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser, extending the deadline under Section 365(d)(4) of the Bankruptcy Code for the assumption of all unexpired leases of nonresidential real property to a date that is not later than September 22, 2023.

d)   The Purchaser may, at any time and from time to time through (and including) (i) with respect to any Assigned Agreement(s), the date of the Closing, and (ii) with respect to any Designation Rights Assets that constitute Real Property Leases, 90 days after Closing, unless further extended by written agreement between Purchaser and Seller, and with respect to any Designation Rights Assets that constitute Contracts,  180 days after Closing (as applicable, the "Designation Deadline"), notify the Seller to include in the definition of Assigned Agreements, any Contract or Real Estate Lease of any of the Sellers not otherwise included in the definition of Assigned Agreements, and require such Seller to give not less than five (5) Business Days' notice to the non-Seller parties to any such Contract of the Sellers' proposed assumption and assignment thereof to the Purchaser; provided, that no such change of the definitions of Assigned Agreements referred to in this sentence will reduce or increase the amount of the Purchase Price.

e)   The Purchaser may, at any time and from time to time through (and including) the applicable Designation Deadline, exclude from the definition of Assigned Agreements, any Contract of any of the Sellers otherwise included in the definition of Assigned Agreements; provided, that no such change of the definitions of Assigned Agreements referred to in this sentence will reduce or increase the amount of the Purchase Price.

f)   With respect to any Designation Rights Asset, the Management Agreement covers

such Designation Rights Asset during the term (the "<u>Designation Rights Asset Term</u>") commencing as of the Closing Date and continuing until the earlier of (A) the applicable Designation Deadline, (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to the Purchaser, and (C) the earlier of (1) five (5) Business Days after the date Sellers receive written notice from Purchaser designating the exclusion of such Designation Rights Asset and (2) the effective date of rejection of any Designation Rights Asset that is not designated for assumption, (ii) the Management Agreement will provide that the Purchaser will directly pay for (or, if applicable, reasonably cooperate with Sellers in pursuing any claims under any insurance policy that relates to such Designation Rights Asset and is transferred to the Purchaser at the Closing in respect of) any costs, expenses, or liabilities incurred by Sellers in the Ordinary Course of Business solely in connection with the Purchaser's operation of such Designation Rights Asset during the Designation Rights Asset Term**,** including costs, expenses, or liabilities arising from or incurred in connection with the administration of the Bankruptcy Cases, (iii) all consideration or proceeds received by Purchaser, if any, in respect of, and other benefits deriving from, such Designation Rights Asset will constitute Purchased Assets and be promptly delivered to the Purchaser (the "<u>Designation Rights Assets Proceeds</u>"), (iv) the foregoing will not affect the validity of the transfer to the Purchaser of any other Purchased Asset whether or not related to such Designation Rights Asset and (v) after the Closing, Purchaser will provide all employees necessary for the operation of the Designation Rights Assets.

g)      To the extent that any Assigned Agreement requires the payment of Actual Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Actual Cure Costs related to such Assigned Agreement, or any portion thereof, will be paid by the Purchaser within seven (7) days of the Closing Date, or such other date that the Assigned Agreement is assumed by the applicable Seller and assigned to the Purchaser. Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court, (A) no Actual Cure Costs with respect to any Designation Rights Asset will be due until the permanent assumption thereof pursuant to this <u>Section 7.5</u> and (B) the Purchaser will not have any Liabilities with respect to any Non-Assigned Agreement.

h)      Notwithstanding anything herein to the contrary, if any Designation Rights Asset becomes a Non-Assigned Agreement, Purchaser will thereafter be responsible, in addition to any other costs for which the Purchaser is liable under this <u>Section 7.5</u>, for all costs applicable to the period after the Closing, including costs of closing the restaurant at that location, including de-imaging costs, with respect to such Non-Assigned Agreement.

7.6.    <u>**Notices.**</u> If at any time (a) Purchaser actually becomes aware of any material breach by Sellers of any representation, warranty, covenant, or agreement contained herein and such

breach is capable of being cured by Sellers; or (ii) Sellers actually become aware of any breach by Purchaser of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach will promptly notify the other Party, in accordance with <u>Section 12.1</u>, in writing of such breach. Upon such notice of breach, the breaching Party will have until the earlier of (a) ten (10) days after receiving such notice, or (b) the Closing Deadline, to cure such breach prior to the exercise of any remedies in connection therewith.

7.7.   **<u>Casualty, Condemnation, Loss of Lease.</u>**

a)      If, prior to Closing, any Leased Real Property and the associated Improvements or any part thereof will be subject to a taking by any public or quasi- public authority through condemnation, eminent domain, or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, "<u>Condemnation</u>"), Purchaser will take title to the Purchased Assets relating to such affected Leased Real Property and Improvements notwithstanding such Condemnation. At the Closing, Purchaser, will succeed to (i) the rights of the applicable Seller to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation ("<u>Condemnation Proceeds</u>"), and (b) the rights to settle any such Condemnation proceeding, and Purchaser will, at Closing succeed to the rights of the applicable Seller to all required proofs of loss, assignments of claims and similar items. The Sellers, at Closing, will assign to Purchaser all right, title and interest to any claims or proceeds Seller may have. The Sellers may not settle any such proceedings without the consent of Purchaser, such consent not to be unreasonably withheld or delayed. Sellers' compliance with this <u>Section 7.7(a)</u> will cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a condemnation event.

b)      If, prior to Closing, any Leased Real Property and the associated Improvements or any part thereof is destroyed or damaged by fire, earthquake, flood, or other casualty (collectively, "<u>Casualty</u>"), Purchaser will take title to the Purchased Assets relating to such affected Leased Real Property and Improvements notwithstanding such Casualty. At the Closing, Purchaser, will succeed to (i) the rights of the applicable Seller to the Casualty proceeds, including insurance proceeds, with respect to such Casualty ("<u>Casualty Proceeds</u>"), including without duplication, giving Purchaser a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by the applicable Seller and not applied by the applicable Seller to repair prior to Closing, and (ii) the rights to settle after Closing any loss under all policies of insurance applicable to the Casualty, and Purchaser will, at Closing and thereafter, succeed to the rights of the Sellers to all required proofs of loss, assignments of claims and other similar items and Sellers will, at Closing, assign same to Purchaser. The Sellers may not settle any such claims without the consent of Purchaser; such consent not to be unreasonably

withheld or delayed. Sellers' compliance with this <u>Section 7.7(b)</u> will cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a casualty event.

7.8.   **Tax Cooperation.** Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of the forms contemplated in <u>Section 2.7</u>, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Sellers and Purchaser will cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

7.9.   **Transfer Taxes.** Any and all sales, use, transfer, recording, or other similar taxes or charges (the "<u>Transfer Taxes</u>") assessed as a result of the Closing on the transfer of any Purchased Assets will be timely paid by Purchaser. Purchaser and Sellers will cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

7.10.    **Property Taxes.** All Property Taxes for a Tax period which includes (but does not end on) the Closing Date will be apportioned between the Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing. The Purchase Price will be adjusted for the Property Tax Estimate as provided in Section 2.7 hereof and following the Closing, Purchaser will be liable for all Property Taxes that are attributable to the Purchased Assets.

7.11.   **Payment.** Property Taxes and Transfer Taxes will be timely paid by the Purchaser, and all applicable filings, reports and returns will be filed, as provided by applicable Law.

**8.**
**EMPLOYEE MATTERS**

8.    **Employee Matters.**

8.1.   **Employees and Offers of Employment.**

a)   As of the Closing Date, Purchaser will offer employment to all employees of Sellers who are employed in connection with the Business at the Purchased Locations (excluding above-store level employees) and any location that has been identified pursuant to <u>Section 7.5</u> as a Designation Rights Asset, at the same (or better) salary or wage and benefit levels and on such other terms and conditions as are in effect at Closing. Any employee of Sellers who accepts an offer of employment from Purchaser pursuant to this <u>Section 8.1(a)</u> will be a "<u>Transferred Employee</u>").

b)      Purchaser will maintain employee records transferred to Purchaser hereunder for a period of not less than four years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser will maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records.

c)      Nothing herein, express or implied, will confer upon any employee or former employee of any Seller any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Purchaser and each Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of any Seller.

d)      Sellers will retain liability for, and Purchaser will not acquire or assume, any litigation related to or any liability arising from any employee or any employment, benefit or related matters of Sellers arising prior or after the Closing with respect to any non-Transferred Employee, whether a claim in respect thereto is brought on, before, or after the Closing Date.

e)      Unless agreed to otherwise in writing by the Purchaser and the Transferred Employee, all Transferred Employees will be employees "at-will".

8.2.    **Employee Plans.** Following the Closing Date, Purchaser will use commercially reasonable efforts to ensure that no waiting periods, exclusions, or limitations with respect to any pre-existing conditions, evidence of insurability or good health, or actively-at-work exclusions are applicable to any Transferred Employee or their dependents or beneficiaries under any welfare benefit plans in which such employees may be eligible to participate, subject in all events to the terms of such plans.

8.3.    **Workers' Compensation.** Sellers will be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Sellers' employees prior to the Closing Date. Purchaser will be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by Transferred Employees on and after the dates (hereinafter, "Transferred Employees' Employment Date") Purchaser hires them, including injuries sustained by a Transferred Employee on or after the Transferred Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Transferred Employees' Employment Date. Sellers will be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate Workers' Compensation

authority within forty-five (45) days after the Transferred Employees' Employment Date. Purchaser will be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Transferred Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Transferred Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than forty-five (45) days after the Transferred Employees' Employment Date.

**9.**
**CLOSING CONDITIONS**

9.1.    **Conditions to Obligations of Purchaser and Sellers.** The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

a)    The Bankruptcy Court must have entered the Sale Order in the Bankruptcy Cases, authorizing the Transactions and approving this Agreement under Sections 105(a), 363, 365, of the Bankruptcy Code, in form and substance reasonably acceptable to Sellers and Purchaser, and as of the Closing Date the Sale Order must be in full force and effect, must not then be stayed, and must not have been vacated or reversed.

b)    No Material Adverse Effect has occurred with respect to the Purchased Assets.

c)    No injunction, stay, or similar Order issued by any Governmental Authority is in effect that restrains, enjoins, stays, or prohibits the consummation of the Transactions.

9.2.    **Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

a)    Sellers have performed in all material respects all of their obligations hereunder required to be performed by Sellers on or prior to the Closing Date;

b)    The representations and warranties of Sellers contained in this Agreement must be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they must be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect;

c)    Purchaser has received the Organizational Amendments;

d)    All Actual Cure Costs as of the Closing Date have been paid; and

e)      Sellers have delivered all of the items required by Section 2.11.

f)      Schedules to this agreement are satisfactory to Purchaser in its sole discretion.

g)      The Bankruptcy Court has entered the Bidding Protections Order and Purchaser is an approved bidder.

h)      The Sale Order must be entered no later than three days after the Sale Hearing, which shall take place no later than June 1, 2023.

9.3.    **Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

a)      Purchaser have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

b)      The representations and warranties of Purchaser contained in this Agreement are true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they must be true and correct in all material respects as of such earlier date);

c)      Sellers have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Sellers; and

d)      Purchaser has delivered all of the items required by Section 2.12.

9.4.    **Waiver of Closing Conditions.** Notwithstanding anything to the contrary contained herein, if any of the conditions to Closing were not fulfilled at or prior to the Closing and the parties hereto agree to close the transactions contemplated by this Agreement, then following the Closing all such conditions to Closing will be deemed to have been waived effective as of the Closing.

**10.**
**SURVIVAL; INDEMNIFICATION**

10.1.   **Survival.** The (a) representations and warranties of Sellers, and (b) covenants and agreements of Sellers and Purchaser that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, will not survive the Closing. The covenants and agreements of Sellers and Purchaser contained herein that by their terms are to be performed after Closing will survive the Closing for such terms.

10.2.  **Indemnification.** There will be no post-Closing indemnification of Purchaser by Sellers with respect to any matter not set forth in this <u>Section 10.2</u>.

# 11.
## TERMINATION

11.1.  **Grounds for Termination.** This Agreement may be terminated at any time prior to the Closing:

a)      by mutual written agreement of Sellers and Purchaser;

b)      by Sellers or Purchaser, if the Closing has not been consummated on or before June 14, 2023 (the "<u>Closing Deadline</u>"), unless the Party seeking termination is in breach of its obligations hereunder;

c)      by Sellers or Purchaser, if any condition set forth in Section 9.1 is not satisfied, and such condition is incapable of being satisfied by the Closing Deadline;

d)      by Purchaser, if any condition set forth in Section 9.2 has not been satisfied, and such condition is incapable of being satisfied by the Closing Deadline;

e)      by Sellers, if any condition set forth in Section 9.3 has not been satisfied, and such condition is incapable of being satisfied by the Closing Deadline; or

f)      by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this <u>Section 11.1</u> (other than pursuant to <u>Section 11.1(a)</u>) will give notice of such termination to the other Party in accordance with <u>Section 12.1</u>.

11.2.  **Effect of Termination.** If this Agreement is terminated as permitted by <u>Section 11.1</u>, such termination will be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Sections 2.9(b)</u>, and <u>11.4</u>. The provisions of <u>Sections 2.9</u>, <u>6.1</u>, <u>7.4</u>, <u>11.2</u>, <u>11.3</u>, <u>11.4</u>, <u>12.1</u>, <u>12.4</u>, <u>12.5</u>, <u>12.6</u>, <u>12.8</u>, <u>12.9</u> and <u>12.10</u> will survive any termination hereof pursuant to <u>Section 11.1</u>.

11.3.    **Expenses.** Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement or the Transactions will be paid by the Party incurring such cost or expense.

11.4.    **Exclusive Remedies.** Effective as of Closing, Purchaser waives irrevocably any rights and Claims Purchaser may have against Sellers, whether in Law or in equity, relating to (a) any breach of a representation, warranty, covenant, or agreement contained herein and occurring on or prior to the Closing, or (b) the Purchased Assets, the Assumed Liabilities or the Business. Purchaser and Sellers acknowledge and agree that if this Agreement is terminated pursuant to Section 11.1, the provisions of Section 11.2 and this Section 11.4 set forth the sole and exclusive remedies of the Parties.

## 12.
## MISCELLANEOUS

12.1.    **Notices.** All notices, requests and other communications to any Party hereunder must be in writing (including facsimile transmission) and must be given,

if to Purchaser, to:

Corbak Acquisition LLC
777 West Putnam Avenue
Greenwich, CT 06830
Attn: Legal
Email: legal@wexford.com

with a copy to (which will not constitute notice):

Lathrop GPM LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108-2618
Attn: Benjamin Struby and Ryan Palmer
Email: benjamin.struby@lathropgpm  and  ryan.palmer@lathropgpm

DocuSign Envelope ID: 7DAFDFD8-394B-4E20-B945-32D751BA0921

if to Sellers, to:

CBC Restaurant Corp.
d/b/a Corner Bakery
121 Friends Lane, Suite 301
Newtown PA 18940
Attention: Greg Baracato, Chief Restructuring Officer
Email: greg.baracato@cr3partners.com
Email: winston.mar@cr3partners.com

with copies to (which will not constitute notice):

Culhane Meadows PLLC
3411 Silverside Road
Baynard Building, Suite 104-13
Wilmington, Delaware 19810
Attention: Mette H. Kurth
Email: mkurth@cm.law
Email: lwarman@cm.law

All such notices, requests, and other communications will be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication will be deemed not to have been received until the next succeeding Business Day in the place of receipt.

12.2.    **Waivers.** No failure or delay by any Party in exercising any right, power, or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative.

12.3.    **Successors and Assigns.** The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns; *provided, however*, that no Party may assign, delegate, or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party.

12.4.    **Governing Law.** This Agreement is governed by and construed in accordance with the internal Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code,

without regard to the principles of conflicts of Law that would provide for application of another Law.

12.5.    **Jurisdiction.**

    a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions must be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 12.1</u> will be deemed effective service of process on such Party.

    b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement will be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of the state or Federal courts located in Delaware. (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by  Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 12.1</u> will be deemed effective service of process on such Party.

12.6.    **Waiver of Jury Trial.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

12.7.   **No Third Party Beneficiaries.** No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

12.8.   **Entire Agreement; Amendments; Counterparts.** This Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Sellers that expressly states that it is intended to amend this agreement. This Agreement may be executed in counterparts, each of which when taken together will constitute an original. This Agreement will become effective when each Party hereto has received a counterpart hereof signed by the other Party hereto.

12.9.   **Headings, Interpretation.** The headings contained in this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

12.10.  **Affiliate Acquisitions.** Notwithstanding anything to the contrary contained in this Agreement, Purchaser may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Affiliates as may be designated by Purchaser from time to time prior to the Closing.

12.11.  **Disclosure Schedules.** The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in the Schedules will not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material. If any Schedule discloses an item or information, the matter will be deemed to have been disclosed in all other Schedules for which such information is reasonably apparent, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CORBAK ACQUISITION LLC**

By: _____

Name: Arthur Amron _____

Title: Vice President _____


**CORNER BAKERY HOLDING COMPANY**

By: _____

Name: _____

Title: _____


**CBC RESTAURANT CORP.**

By: _____

Name: _____

Title: _____


**CBC CARDCO, INC.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Agreement to be executed and delivered as of the date first above written.

**PURCHASER:**

**CORBAK ACQUISITION LLC**

By: _____

Name: _____

Title: _____


**SELLERS:**

**CORNER BAKERY HOLDING COMPANY**

By: *Greg Baracato*

Name: *Greg Baracato*

Title: *Chief Restructuring Officer*


**CBC RESTAURANT CORP.**

By: *Greg Baracato*

Name: *Greg Baracato*

Title: *Chief Restructuring Officer*


**CBC CARDCO, INC.**

By: *Greg Baracato*

Name: *Greg Baracato*

Title: *Chief Restructuring Officer*

**EXHIBIT B**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into between CORNER BAKERY HOLDING COMPANY; CBC RESTAURANT, CORP.; CBC CARDCO, INC.; (collectively, the "Sellers") and [●], a [Delaware limited liability company ("Purchaser"), this day _____ of June 2023 (the "Effective Date").

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of _____ , 2023 (the "Asset Purchase Agreement") by and among Sellers and Purchaser, each Seller agreed to sell to Purchaser and Purchaser agreed to purchase from each Seller, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, all of Sellers' right, title and interest in and to the Purchased Assets, as the same are described in the Asset Purchase Agreement, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities) pursuant to Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have agreed to assign and transfer certain rights and agreements to Purchaser, and Purchaser has agreed to assume the Assumed Liabilities as partial consideration for the Purchased Assets; and

WHEREAS, capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, pursuant to the Asset Purchase Agreement and in consideration of the promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed that:

1. Transfer of Purchased Assets. Upon the terms and conditions of the Asset Purchase Agreement, Sellers do hereby assign, transfer, convey, grant, sell, bargain, set over, alien, remise, release, deliver and confirm unto Purchaser, and Purchaser hereby accepts from

Sellers, all of the Sellers' assets, properties, rights, titles and interests in and to the Purchased Assets in accordance with the terms of the Asset Purchase Agreement.

      2.      <u>Assumption and Assignment</u>. As of the Effective Date, Sellers have assumed pursuant to Section 365 of the Bankruptcy Code the Assigned Agreements and hereby assign, grant, convey, sell, transfer and set over (collectively, the "<u>Assignment</u>") to Purchaser all of Sellers' right, title, benefit, privileges and interest in and to, and all of Sellers' burdens, obligations and liabilities in connection with, each of the Assigned Agreements and the Assumed Liabilities. Effective as of the Effective Date, Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to perform and discharge all of the liabilities of Sellers to be observed, performed, paid or discharged from and after the Closing, in connection with the Assigned Agreements and the Assumed Liabilities.

      3.      <u>Conflict with Asset Purchase Agreement</u>. The Asset Purchase Agreement is incorporated herein by reference and will continue in full force and effect as though set forth herein at length to the extent provided for in the Asset Purchase Agreement. To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of the Asset Purchase Agreement, the Asset Purchase Agreement will govern and control.

      4.      <u>Governing Law; Counterparts</u>. This Agreement and all documents, instruments and agreements executed and delivered pursuant to the terms and provisions hereof will be governed by and construed in accordance with the Bankruptcy Code, and to the extent not inconsistent with the Bankruptcy Code, the laws of the State of Delaware without regard to conflicts of laws principles that would require the application of any other law. This Agreement may be executed in counterparts, each of which will be deemed an original but all of which together will constitute one and the same agreement. Delivery of an executed signature page of this Agreement by electronic transmission will be effective as delivery of a manually executed counterpart hereof.

      5.      <u>Further Assurances</u>. If at any time after the delivery of this instrument any further action is necessary to carry out the purposes of this Agreement, Sellers will take, at Purchaser's sole cost and expense, such further actions (including the execution and delivery of such further instruments and documents) as Purchaser may reasonably request.

6.    <u>Successors and Assigns</u>. This Agreement will be binding upon the Sellers and their respective successors and assigns, effective immediately upon its delivery to Purchaser. This Agreement will be binding upon Purchaser and its successors and assigns, effectively immediately upon delivery of this Agreement to Sellers.

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Agreement to be executed and delivered as of the date first above written.

**PURCHASER:**

**[●]**

By: _____

Name: _____

Title: _____

**SELLERS:**

**CORNER BAKERY HOLDING COMPANY**

By: _____

Name: _____

Title: _____

**CBC RESTAURANT CORP.**

By: _____

Name: _____

Title: _____

**CBC CARDCO, INC.**

By: _____

Name: _____

Title: _____