# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**CBC RESTAURANT CORP.**, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10245 (KBO)<br>(Jointly Administered)<br><br>**Objection Deadline:**<br>[TBD]<br><br>**Hearing Date:**<br>[TBD]<br><br>Re: Dkt. No. 361, 469 |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER: (A) APPROVING BID PROTECTIONS IN CONNECTION WITH THE PROPOSED STALKING HORSE ASSET PURCHASE AGREEMENT (CORBAK ACQUISITION LLC); AND (B) GRANTING RELATED RELIEF**

CBC Restaurant Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "Corner Bakery"),[2] respectfully state the following in support of this motion (this "Motion").[3]

## RELIEF REQUESTED

1. Corner Bakery seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"): (a) authorizing, but not requiring, Corner Bakery to enter into

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include CBC Restaurant Corp. (0801), Corner Bakery Holding Company (3981), and CBC Cardco, Inc. (1938). The Debtors' service address is 121 Friends Lane, Suite 301, Newtown PA 18940.

[2] Descriptions of the Debtors and their business and the Debtors' chapter 11 cases are set forth in detail in the *Declaration of Jignesh Pandya, Chief Executive Officer and Chief Operating Officer of CBC Restaurant Corp. in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed on February 23, 2023, at Doc. No. 22.

[3] Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the Bid Procedures.

the *Asset Purchase Agreement By and Between Corbak Acquisition LLC and Corner Bakery Holding Company, CBC Restaurant Corp., and CBC Cardco, Inc. Dated May 19, 2023* (the "Stalking Horse APA") submitted with the *Notice of Selection of Proposed Stalking Horse Purchaser (Corbak Acquisition LLC) and Filing of Proposed Stalking Horse Asset Purchase Agreement* (the "Stalking Horse Notice") [Dkt. No. 469] filed concurrently with this Motion and incorporated herein by reference; (b) authorizing Corner Bakery to provide a break-up fee and expense reimbursement to Corbak Acquisition LLC (the "Stalking Horse Bidder") as provided for in Stalking Horse APA (the "Bid Protections'"); and (c) granting related relief.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (Sleet, C.J.).

3.     The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BASIS FOR RELIEF**

5. The bases for the relief requested in this Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1, and 9006-1.

**BACKGROUND**

A. **The Business and Events Leading to These Bankruptcy Filings**

6. Corner Bakery is a fast-casual restaurant serving kitchen-crafted breakfast, lunch, and dinner and catering to guests. Its restaurants have been a neighborhood favorite since the brand was established in 1991. The original American Italian bakery cafe was founded on a philosophy of creating a warm and comfortable place for people to relax with friends, family, and neighbors. Today, the restaurant features artisan-inspired, seasonal menu options made with fresh ingredients, while delivering a premier bakery cafe experience in the heart of neighborhoods and urban markets across California, Texas, Pennsylvania, Illinois, Virginia, Maryland, and the District of Columbia.

7. On the February 22, 2023 (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. An Official Committee of Unsecured Creditors (the "Committee") was formed on March 20, 2023.

B. **The Bid Procedure Motion**

8. On April 7, 2023, Corner Bakery filed the *Debtors' Motion for Entry of Orders: (I)(A) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets; (B) Authorizing the Debtors to Enter Into a Stalking Horse Agreement; (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (D) Approving Assumption and*

*Assignment Procedures; and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Dkt. No. 289]. The Court entered its Order [Dkt. No. 361] approving the bidding procedures motion on April 20, 2023 (the "Bid Procedures Order").

9. Pursuant to Paragraph 11 of the Bid Procedures Order, Corner Bakery may, subject to further Court approval, enter into a Stalking Horse APA. If Corner Bakery enters into a Stalking Horse APA, which may include bid protections for parties other than the Debtors' senior lender, SSCP Restaurants, LLC (the "Senior Lender") or a Related Party (as defined below), they must file a Stalking Horse Notice with the Bankruptcy Court and serve the Stalking Horse Notice on: (i) counsel to the Committee; (ii) the United States Trustee; (iii) counsel to the Senior Lender; and (iv) any other party that has requested notice pursuant to Bankruptcy Rule 2002 by overnight mail and, if known, by electronic mail. The Stalking Horse Notice must: (i) include a copy of the Stalking Horse APA and (ii) disclose whether the Stalking Horse Bidder is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code (an "Insider"), as well as any common identity of incorporators, directors, officers, or controlling stockholders between the Stalking Horse Bidder and the Debtors (a "Related Party").[4] As noted above, the Stalking Horse Notice has been filed and served concurrently with this Motion and in accordance with the Bid Procedures Order.

---

[4] The Debtors will also provide contract and lease counterparties with the adequate assurance information required under Section II.(m) of the Bid Procedures within twenty-four (24) hours after the filing of the Stalking Horse Notice and this Motion.

10. If no objection to the proposed Stalking Horse APA is filed and served upon Corner Bakery within three business days following service of the Stalking Notice, Corner Bakery may submit an Order approving the designation of the Stalking Horse Bidder to the Court under Certificate of No Objection. If any objection to the proposed designation of the Stalking Horse Bidder or the accompanying Stalking Horse APA is received, Corner Bakery may seek an expedited hearing thereon. The Debtors shall promptly provide a copy of any approved Stalking Horse APA to any Potential Bidders.

11. Paragraph 11 of the Bid Procedures Order further provides that, if the Debtors seek to provide bid protections to a Stalking Horse Bidder in the Stalking Horse APA, then the Debtors will seek authority from the Court in a separate pleading from the Stalking Horse Notice. This Motion has been filed in compliance with Paragraph 11.

C. **The Stalking Horse APA and the Proposed Bid Protections.**

12. Corner Bakery received an initial letter of interest with respect to the Stalking Horse APA on May 3, 2023 (the "LOI") and setting forth the required Bid Protections for the Stalking Horse Bidder. It promptly provided the LOI to its Senior Lender and the Committee, as consultation parties, for review and comment together with a draft of this Motion. Since that time, Corner Bakery has been engaged in negotiations with the Stalking Horse Bidder to finalize an asset purchase agreement while taking into account the comments provided by the Senior Lender and the Committee (to the extent feasible and to the extent such comments were not inconsistent with one another). As part of that process, the Debtors obtained a revised LOI on May 10, 2023, which it provided to the Senior Lender and Committee for further review and comment. While the Debtors were continuing to negotiate and finalize the Stalking Horse APA, on May 16, 2023, they received an alternative stalking hose proposal from the Stalking Horse Lender. After evaluating

both proposals and consulting with the Committee, the Debtors' in the exercise of their business judgment, have determined that the Stalking Horse APA provided by Corbak Acquisition LLC represents the highest and otherwise best offer for the Debtors' assets and that it is in the best interest of the Debtors' estate and creditors for the Debtors to obtain authorization to enter into the Stalking Horse APA as soon as practicable prior to the bid deadline on May 25, 2023, as established under the Bid Procedures Order.

13. The Stalking Horse Bidder has confirmed that it is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and that there is no common identity of incorporators, directors, officers, or controlling stockholders between the Stalking Horse Bidder and the Debtors and that the Stalking Horse Bidder has no connections or agreements with the Debtors or any other known potential bidder, insiders, manager, operator, or direct or indirect equity security holder of the debtors. The Stalking Horse APA does not otherwise contemplate a sale to an Insider or a Related Party.

14. The Stalking Horse Bidder has confirmed that neither it nor any of its agents or representatives have entered into any agreements (verbally or otherwise) with the Debtors' insiders, management, or key employees regarding compensation, future employment, or other participation in the ownership or operation of Corner Bakery, and except as set forth herein, neither the Stalking Horse Bidder nor any of its agents or representatives have engaged in any discussions with the Debtors' insiders, management, or key employees regarding any such agreements.

15. Jay Pandya, has from time to time previously discussed with Jeff Crivello, one of the Buyer's representatives, the possibility of engaging Mr. Crivello to operate Corner Bakery in connection with a plan of reorganization and for Mr. Crivello to assist Corner Bakery in raising capital in connection with a reorganization or a settlement with SSCP. Similarly, Mr. Crivello

spoke with SSCP to communicate his interest in serving as Corner Bakery's Chief Restructuring Officer. However, no agreements were reached with either SSCP or Mr. Pandya. As of May 1, 2023, Mr. Pandya and Mr. Crivello terminated further discussions. Mr. Crivello is currently serving as one of the Stalking Horse Bidder's representatives and assisting it in connection with the proposed Stalking Horse APA. The Stalking Horse Bidder does not intend to engage in any communications with Mr. Pandya or other Insiders of the Debtors in connection with the Stalking Horse APA or proposed transaction, but if such discussions become necessary or the Stalking Horse Bidder is required to make any decisions with respect to Mr. Pandya or other Insiders of the Debtors in connection with the Stalking Horse APA or proposed transaction, the Stalking Horse Bidder has confirmed that Mr. Crivello will be subject to an "ethical wall" and will not participate in such discussions or decisions.

16. The Stalking Horse APA is conditioned on entry of an order approving the Bid Protections on or before May 24, 2023. Specifically, the terms of the Stalking Horse Bid include certain protections:

> ***Break-Up Fee***. Upon the approval of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a prevailing bid for the Purchased Assets, Sellers will cause the Escrow Agent to return the Good Faith Deposit to the Purchaser. Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a prevailing bid for the Purchased Assets, Sellers will pay to Purchaser a fee consisting of cash or other immediately available funds in an amount equal to: (i) 3% of the Purchase Price capped at $750,000; and (ii) Purchaser's reasonable and actual expenses in an amount not to exceed $400,000 (the "Breakup Fee"); provided, however, the Breakup Fee will not be due and payable if Purchaser has committed a material breach of this Agreement prior to the consummation of such sale to the third party. The Parties agree that the Breakup Fee and the return of the Good Faith Deposit will be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 11.1(f). The provisions of this Section 7.4(b) will survive any termination of this Agreement pursuant to Section 11.1(f). The Breakup Fee will be an allowed administrative expense claim in the

Bankruptcy Cases to be paid solely from the cash proceeds of any approved sale of the Purchased Assets to a third party, will be paid to Purchaser within three Business Days following the closing of such sale to a third party, and will be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party will attach to the portion of the sale proceeds representing the Breakup Fee).

## ARGUMENT

### A.  The Stalking Horse Bid Protections are in the Best Interests of the Debtors' Estates and Should Be Approved.

17. Courts have consistently found that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an `articulated business justification'") (internal citations omitted); *In re Martin,* 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper)*; *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Res., Inc.,* 147 B.R. 650, 656-7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

18. The paramount goal in any proposed sale of a debtor's property is to maximize the proceeds received by the estate. *See In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *Integrated Res.,* 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value

received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Res.,* 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

19.  The Debtors believe that the proposed Stalking Horse Protections will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers. Accordingly, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

20.  The Debtors submit that the proposed Stalking Horse Protections will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and are consistent with other procedures previously approved by this district. *See In re Destination Maternity Corporation,* Case No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Kona Grill, Inc.*, Case No. 19-10953-CSS (CSS) (Bankr. D. Del May 29, 2019); *In re Marsh Supermarkets Holding,* Case No. 17-11066 (BLS) (Bankr. D. Del. May 30, 3017); *In re United Road Towing, Inc.,* Case No. 17-10249 (LSS) (Bankr. D. Del. Mar. 6, 2017).

**B.  The Stalking Horse Bid Protections Have a Sound Business Purpose and Should Be Approved.**

21.  The Debtors have agreed to pay a breakup fee consisting of cash or other immediately available funds in an amount equal to 3% of the Purchase Price capped at $750,000 and reasonable and actual expenses in an amount not to exceed $400,000 should the Stalking Horse Bidder not be the successful bidder and if the Debtors close an alternative transaction. The use of

a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). However, stalking horse purchasers virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.[5]

22. Break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *See Integrated Res*., 147

---

[5] See*, e.g., In re Brooks Bros. Grp., Inc*., Case No. 20-11785 (CSS) Bankr. D. Del. Aug. 3, 2020) [Docket No. 285] (authorizing a break-up fee of 3% of the purchase price and an expense reimbursement capped at $1 million); In re Lucky Brand Dungarees, LLC, Case No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) [Docket No. 251] (authorizing breakup fee (defined in Stalking Horse Purchase Agreement at Docket No. 349-1) equal to 3% of sum of purchase price, credit bid, value of standby letters of credit, and $7 million in respect of assumed liabilities, and an expense reimbursement capped at $1 million); In re Templar Energy LLC, Case No. 20-11441 (BLS) (Bankr. D. Del. June 29, 2020) [Docket No. 130] (authorizing break-up fee of 3% of the cash component of the stalking horse purchase price and expense reimbursement up to $350,000); In re Lucky's Market Parent Co., LLC, Case No. 20-10166 (JTD) (Bankr. D. Del. Feb. 26, 2020) [Docket No. 282] (authorizing a break-up fee of 3% of the purchase price, an expense reimbursement of $250,000, and a perpetual topping fee of $250,000 at each bid increment); In re Celadon Grp., Inc., Case No. 19- 12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [Docket No. 219] (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); In re Bumblebee Parent Inc., Case No. 19-12502 (LSS) (Bankr D. Del. Dec. 19, 2019) [Docket No. 171] (approving a break-up fee of up to $23,125,000 (approximately 2.5%), plus a separate expense reimbursement in the maximum amount of $2.5 million).

B.R. at 659–60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *See 995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc*., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc*., 181 F.3d 527 (3d Cir. 1999).

23.  The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse APA will establish a floor for further bidding that may increase the consideration given in exchange for the Debtors' assets for the benefit of the Debtors' estates. Here, the Bid Protections are a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transaction, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Breakup Fee and expense reimbursement in good faith and at arm's length with significant give- and-take after consultation with the Senior Lender and the Committee. As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids

at the auction. The Bid Protections are consistent with the range of bid protections typically paid in sale transactions approved by courts in this jurisdiction.

24. If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse bidder, to the detriment of the Debtors' estates. Further, if the Bid Protections were to be paid, it likely will be because the Debtors have received higher or otherwise superior offers for the assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances because they constitutes a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *See Integrated Res.*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

### C. The Bid Protections Should Be Approved as an Exercise of the Debtors' Sound Business Judgment.

25. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" ); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

26. Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of

the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656.

## NOTICE

27. The Debtors have provided notice of this Motion to: (a) the Senior Lender and its counsel; (b) the Committee and its counsel; (c) the Office of the United States Trustee for the District of Delaware; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

28. No prior request for the relief sought in this Motion has been made by Corner Bakery to this or any other court.

**WHEREFORE**, Corner Bakery respectfully requests that the Court enter an Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  May 19, 2023  
Wilmington, Delaware

*/s/ Mette H. Kurth*  
Mette H. Kurth (DE Bar No. 6491)  
**CULHANE MEADOWS, PLLC**  
3411 Silverside Road  
Baynard Building, Suite 104-13  
Wilmington, Delaware 19810  
Telephone: (302) 289-8839, Ext. 100  
Email: mkurth@cm.law

*Counsel to the Debtors and Debtors In Possession*

## Exhibit A

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> **CBC RESTAURANT CORP.**, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-10245 (KB) <br><br> (Jointly Administered) <br><br> Re: D.I. No. [●] |

## ORDER GRANTING STALKING HORSE BID PROTECTIONS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) [●], all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court finding that it may enter a final order consistent with Article III of the United States Constitution; and this Court finding that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court finding that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include CBC Restaurant Corp. (0801), Corner Bakery Holding Company (3981), and CBC Cardco, Inc. (1938). The Debtors' service address is 121 Friends Lane, Suite 301, Newtown PA 18940.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. Corner Bakery is authorized, but not required, to enter into the *Asset Purchase Agreement By and Between Corbak Acquisition LLC and Corner Bakery Holding Company, CBC Restaurant Corp., and CBC Cardco, Inc. Dated May 19, 2023* submitted with the *Notice of Selection of Proposed Stalking Horse Purchaser (Corbak Acquisition LLC) and Filing of Proposed Stalking Horse Asset Purchase Agreement* (the "Stalking Horse APA").

3. Corner Bakery is authorized to provide a break-up fee and expense reimbursement to Corbak Acquisition LLC as provided for in Stalking Horse APA.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the Local Rules are satisfied by such notice.

5. The terms and conditions of this Order are effective and enforceable immediately upon its entry.

6. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7. This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.